## Daniel v. Commonwealth.

(Decided March 9, 1923.)

### Appeal from Clark Circuit Court.

1. Homicide—Evidence Held to Sustain Conviction of Voluntary Manslaughter.—Evidence that deceased was shot during an altercation with defendant held sufficient to sustain a conviction of voluntary manslaughter, notwithstanding defendant's claim that deceased first attempted to shoot defendant.

2. Homicide—Declaration Held to Have Been Made in Extremis.—A declaration, made to a physician on the same afternoon on which declarant died, and after the doctor had told him he would die from the effects of the wound, and he had said he felt like he was going to die, was sufficiently shown to have been made in extremis to be competent.

3. Homicide—Dying Declaration Erroneously Excluded Cannot be Considered on Appeal.—Even though a dying declaration was erroneously excluded from evidence, it cannot be considered on defendant's appeal in determining whether the evidence was sufficient to sustain the conviction.

4. Homicide—Proof of Business of Deceased Held Not Incompetent as Character Witness.—In a prosecution for homicide, proof that deceased was a farmer, and, when not employed on his own land, hired out to others, though admitted to show that deceased was not the owner or operator of the still at which the difficulty began, was not incompetent as an attempt to establish the good character of deceased before it had been attacked, though such evidence might incidentally affect his character in so far as it disproved his violation of the law by operating a still.

5. Homicide—Affidavit of Absent Witness Which Defendant Might Have Read Considered as in Evidence in Determining Whether New Trial Should be Granted for Cumulative Evidence.—Where defendant in support of a motion for continuance offered an affidavit by an absent witness relating to threats made by deceased against accused, and the Commonwealth consented that the affidavit should be read as the testimony of that witness, but it was not read, the affidavit is to be considered as in evidence for the purpose of determining whether newly discovered evidence, for which a new trial was asked, was merely cumulative.

6. Homicide—Cumulative Evidence as to Threats Generally Does Not Require new Trials.—A new trial will generally not be granted for newly discovered evidence which would be cumulative as to threats generally, though not as to any specific threat, unless the evidence is of such an overwhelming nature and upon such a material point as to render it reasonably probable that a different verdict would be returned.

7. Criminal Law—New Trials Hesitatingly Granted for New Evidence.—New trials are hesitatingly granted on the ground of newly discovered evidence; and, unless the facts of the particular case are such, or the issue to which the new testimony relates is so material, as to produce the conviction from a consideration of the whole record that there has been a miscarriage of justice and the probability that material error has been committed, a new trial will not be ordered on that ground.

8. Homicide—New Evidence as to Threats by Deceased Held Not to Require New Trials.—Where the Commonwealth had consented that an affidavit for continuance might be read as the testimony of the absent witness showing a threat by deceased against ac-

cused, and the evidence showed that accused and deceased were apparently on friendly terms a few minutes before the shooting, it was not error to refuse a new trial on the ground of newly discovered evidence as to a similar threat made by deceased against accused to a different witness.

9.  Criminal Law—Law Inapplicable to Evidence Should not be Given to the Jury.—The law applicable to every state of case supported by the evidence to any reasonable degree should be given to the jury, but it is not necessary to give instructions relating to a state of case which the evidence does not tend to support.

10.  Homicide—Instruction on Accidental Shooting Unnecessary, Where Defendant Testified he Intentionally Fired his Pistol.—In a prosecution for homicide occurring during a struggle between defendant and deceased, it was unnecessary to give an instruction on accidental shooting of deceased, where defendant stated he was trying to pull the trigger, and in another place in his testimony stated he intentionally fired his pistol.

11.  Homicide—Evidence Held not to Warrant Instruction as to Accidental Shooting.—In a prosecution for homicide, which occurred during a struggle between defendant and deceased, evidence held not to support an inference that deceased was shot with the pistol, which defendant testified he had in his hand when the struggle began, instead of with defendant's pistol, so that it was unnecessary to give an instruction on accidental shooting, based on the possibility deceased was shot with his own pistol, notwithstanding defendant's testimony that he intentionally fired his pistol at deceased.

BENTON & DAVIS for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Between 5:30 and 6:00 o'clock on the afternoon of August 12 (Saturday), 1922, Emmett Gilbert was shot near a buggy shed about one hundred yards in front of his dwelling on Cat creek in Powell county. Early the next morning he was carried to a hospital in Winchester, Kentucky, where he died that afternoon or the next day from the effects of the wound. Appellant, C. C. Daniel, was indicted by the grand jury of Clark county charging him with the wilful murder of the deceased, Gilbert, and upon his trial he was convicted of the offense of voluntary manslaughter and punished by the jury with confinement in the penitentiary for the term of twenty-one years.

His motion for a new trial was overruled and he appeals urging through his counsel as grounds for reversal (1), that the verdict is flagrantly against the evidence; (2), error in the admission of evidence introduced by the Commonwealth; (3), newly discovered evidence since the trial, and (4), because the court did not instruct the jury upon the whole law of the case. Other minor matters are referred to in brief, but the above are the only ones which we deem it necessary to consider, and which we will dispose of in the order mentioned.

1.  Up the hollow about half a mile from the residence of the deceased, some one was operating a moonshine still and he was on that day working at it. About two o'clock in the afternoon defendant and Lawton Lacey went to the still, evidently, as appears from the record, to get some whiskey. They found there the deceased and Sid Allen. The parties did more or less drinking and after about two hours the deceased and defendant engaged in a difficulty in which they clinched and in the scuffling broke some of the jars of whiskey that were sitting upon the ground. That difficulty grew out of a charge that defendant had made against deceased accusing the latter, at some time prior thereto, of stealing some whiskey, and in it the damn lie was passed, which the defendant and Lacey say was used by deceased against him, but Allen says he does not know who used that epithet. The parties were in their shirt sleeves and if defendant had any pistol at that place no one knew it or saw it, nor did he offer to draw it. They were separated and somewhere about 4:30 o'clock they dispersed, Gilbert leaving first with a jug of whiskey, Allen going in another direction with a jar of the same goods, and Lacey and defendant then left, with the former carrying a sack with a jug or some jars of the same goods in it, but whether defendant had any of the whiskey when he left is not made clear. They went direct to the house of the deceased who was at the time eating his supper, the other members of his family having finished their supper before he arrived. At the still Lacey had a German pistol which he offered to sell to deceased for $30.00, but no trade was consummated. He carried that pistol along when he and defendant went to the home of deceased, and when they arrived there they asked if the latter was at home and being informed that he was defendant requested deceased to shave him, but before that they were asked to eat their supper which they declined and stated

that they had already had supper. The shaving was done on the back porch of the house and after it was through defendant asked deceased to go home with him or to go to church with him, but the latter declined on the ground that his mother and step-father had arrived that morning and expected to remain over until the next Sunday afternoon and that he could not go. He was then asked if he would not walk a piece of the way with them (defendant and Lacey) and he consented to do so. The trio started down the road and defendant and Lacey testified that deceased produced some whiskey at or about the buggy shed and the parties indulged. It was not dark and members of the household who testified for the Commonwealth said that the three stopped close to a corner of the buggy shed and they heard some boisterous and loud talking and that two of them were close together, if not clinched, and almost instantly two pistol shots were fired and deceased exclaimed, "You have shot me" or "You have killed me;" that Daniel at about that time ran down the road and that some one whom the witnesses could not tell fired three or four shots after that. Deceased was shot but once and the ball penetrated his left side and came out slightly to the left of his spine. Mrs. Gilbert immediately went to the house of a couple of neighbors, and she and the mother of the deceased and his step-father went to the scene and found him lying in the road with the same German pistol that Lacey had tried to sell him on that afternoon lying by him, or in his hands. The neighbors had gotten there and deceased tried to walk to the house but was too weak from the loss of blood and they carried him to it, but before that the mother of the deceased had gotten the pistol and carried it to the house. No one saw any other weapon except a small pocket knife, which was closed in the pocket of deceased. The Commonwealth offered to prove a statement by deceased which he then and there made, but the court excluded it. We do not know what it was, since there was no avowal.

The defendant testified that when they got to the buggy shed they commenced talking in the usual way, but does not state any subject discussed. Finally the subject of purchasing the pistol was brought up and deceased said that he would like to try it and that if he was pleased with it he would give $30.00 for it, provided Lacey would accept moonshine whiskey as part pay; that he then suggested that it was too dark to try the pistol

but told Lacey to let deceased have it and try it at his convenience, which was agreed to. Whereupon, Lacey handed the pistol to defendant and defendant passed it to deceased, at which time defendant suggested that it was time they were going, and he turned to leave, when he heard deceased call his name and in turning to face him the latter again brought up the subject about the stealing of the whiskey and again said that the accusation was a damn lie and that he couldn't live under it; that deceased started to raise the pistol gotten from Lacey and defendant clinched him and grabbed the muzzle of the pistol with both of his hands and that he then released his right hand and drew his pistol which he claimed to be still carrying. About that time he said he remarked to Lacey, ''Knock him in the head, if you don't he is going to kill me,'' but that Lacey made no move and then ''his gun fired and then my gun fired. There wasn't but mighty little difference between them and then he said, 'You have killed me,' '' whereupon defendant started away and deceased fired at him and defendant fired another shot at deceased, and then went to his home. Lacey testified, in substance, the same except he said that deceased said to him, ''Knock him in the head; if you don't I will have to kill him.'' The latter witness remained on the scene until all the shooting was over and left deceased lying in the road with his (witness') pistol which he did not take with him. Witness went to the home of Daniel and got there first but they remained there only a short time and went to the church not far away where they remained about fifteen minutes and then went a distance of about five or six miles where they spent the night, and the next morning they procured a mule and a horse and defendant went away and finally landed in Lexington late Sunday afternoon. He passed through Winchester where deceased was carried, but made no inquiry concerning his condition. He was arrested in Lexington and put in jail, where he remained until his trial.

It is proven by a witness for the Commonwealth that defendant about seven o'clock that night and after the shooting, came to his house and tried to borrow a pistol. Either that night or the next morning, he told two witnesses who testified for the Commonwealth that he ''guessed'' or ''expected'' that he had killed deceased the night before and that the reason he did so was that the deceased was coming on to him with a butcher knife, and he exhibited to one witness a wound on one of his hands

which he said had been inflicted with that weapon. There was testimony showing that if defendant was not interested in the moonshine still he frequently visited it and was a liberal patron. The Commonwealth impeached the character of defendant and he did not attempt to sustain it. If defendant had a pistol on that occasion he testified that it was a 32, whereas the German pistol was a much larger one, and none of the witnesses who testified as to hearing the shots stated any difference in the reports, although the defendant admits that he fired his pistol as many as two times. One theory of the Commonwealth was that Lacey's pistol was the only one there, and that defendant shot the deceased with it and the latter succeeded in taking it away from him and fired the shots he made, and that theory is circumstantially supported to some extent.

The Commonwealth offered to prove a dying declaration by the hospital physician which, as testified to by the witness, was: "He said: 'No, the man came to my house for a shave, and after I shaved him, he asked me to go to the barn and take a drink, and then he told me he was going to shoot me, and he proceeded to shoot me.' He said he wasn't armed, and wasn't expecting to have any trouble." The court excluded it, presumably upon the ground that it was not made in extremis. However, if that was the ground, we think the court erred, since the physician testified that it was made about 3:30 o'clock on the same afternoon when deceased died and that he stated at the time that "He felt like he was going to die," and after the doctor had told him that he would die from the effects of the wound. Since, however, that declaration was not admitted we cannot consider it on this appeal, but from the brief outline of the evidence which we have made, it is apparent that it was sufficient to submit to the jury the issue of defendant's guilt or innocence, and likewise sufficient to sustain the verdict returned, and ground (1), must therefore be denied.

2. Under this ground it is vigorously insisted that the court erred in permitting the Commonwealth to prove the business or occupation in which deceased was engaged. The witnesses testified that he was a farmer and that he cultivated a small acreage in corn and a garden and when not so employed he hired out to others and did such work as he could obtain. It is claimed that such testimony was, in substance, proof of good character

when defendant had not attacked it, and under the rule forbidding such testimony without a previous attack it was erroneously admitted. It seems to us, however, that it requires a very great stretch of the imagination to warp or bend that testimony so as to classify it as proof of either good character or reputation. The purpose of that testimony was to establish the theory of the Commonwealth that the deceased was not the owner or operator of the still, but that on the contrary the defendant was. Its effect was to show that deceased was engaged otherwise than operating the still, and it had a tendency to prove that, although it might incidentally affect his character in so far as it disproved the fact that he was violating the law by operating a still. He can not, however, obtain our consent to treat it as purely character testimony, which under the rule relied on may not be introduced until the character of the one involved is attacked. We, therefore, regard this objection as immaterial.

3. The alleged newly discovered evidence is that of two witnesses, who said in their affidavits that shortly prior to the difficulty deceased told them "that there were two men who had been interfering with his business and that he would have to get rid of them and that he intended to do it," and that one of them was the defendant and one of them was John Rogers.

Defendant filed an affidavit for continuance on account of the absence of material witnesses, one of whom was Wesley Mayfield, and in that affidavit he stated that the absent witness would testify, if present, to identically the same threat made a short while before the difficulty, which affidavit the Commonwealth consented might be read as the testimony of the witnesses, but defendant did not do so or offer to read it. He thus had in his possession the same character of testimony which he or his counsel did not regard of sufficient importance to introduce. We think under the circumstances his case should be treated as though it was introduced, in which event the affidavits of the discovered witnesses would be cumulative on the issue as to threats generally, but not as to any specific one and for which character of testimony a new trial will not ordinarily be granted, unless it is of such an overwhelming nature and upon such a material point as to render it reasonably probable that a different verdict would be returned. Moreover, the rule applied in this court is to hesitatingly grant new trials upon this ground because it is one which may be easily

fabricated and result, not only in delay in the execution of the criminal laws, but also frequently in the administration of justice, and unless the facts of the particular case are such, or the issue upon which the discovered testimony relates is so material, as to produce the conviction from a consideration of the whole record that there has been a miscarriage of justice and the probability that material error has been committed, a new trial will not be ordered upon that ground. Some of the more recent cases so holding are: Johnson v. Commonwealth, 188 Ky. 391; James v. Commonwealth, 197 Ky. 577, and cases referred to therein. In the light of this rule, and bearing in mind the apparent friendliness of the parties just preceding the difficulty, the accommodating shaving of the defendant by the deceased just immediately prior, and the fact that defendant did not introduce the same character of testimony which was in his possession, we conclude that the court did not err in declining to set aside the verdict on this ground.

4. Lastly it is insisted that the court failed to instruct the jury upon the whole law of the case in that he should have given an instruction on accidental shooting, and in support of this contention the cases of Eastridge v. Commonwealth, 195 Ky. 126; Wayne v. Commonwealth, 154 Ky. 698, and Crum v. Commonwealth, 196 Ky. 807, are relied on. Other later cases on the same point are: Davis v. Commonwealth, 193 Ky. 507, and Terrell v. Commonwealth, 194 Ky. 608. The rule as to the duty of the court in instructing the jury, as stated in the Davis case, *supra,* is: "That the law applicable to every state of case supported by the evidence to any reasonable degree should be given to the jury is an axiom, but it is equally true that the law applicable to a state of case which the evidence does not conduce to support need not be given in an instruction to the jury, as the questions at issue would not be elucidated by instructions on abstract legal principles not supported by the facts, though such an instruction is not always held to be prejudicial." In all of the cases where it was held that the instruction on accidental shooting was proper it appeared from the evidence that the defendant, when he fired the fatal shot, did not *intend* to do so, although he may have been engaged at the time in the reckless handling of firearms. In this case defendant not only stated to witnesses who testified for the Commonwealth that he had killed or "guessed he had killed" deceased, but he was asked "Were you conscious

that you were shooting your pistol, pulling the trigger, or whatever you were trying to do?'' and answered, ''I was trying to;'' and at another place in his testimony he stated that he intentionally fired his pistol. There is, therefore, no room for the contention that defendant should be exonerated upon the ground that he accident- ally did the shooting of which he is charged. But it may be insisted that his testimony furnished sufficient grounds for the jury to believe that deceased shot himself with Lacey's pistol which he at the time had in his possession, according to the testimony of defendant. In addition to his testimony, which we have hereinbefore inserted, he was asked, ''Do you know whether he was shot with your pistol, or the one he had? A. No, sir, I do not.'' He made no claim anywhere in his testimony that deceased shot himself, and the above question and answer carry with them but a vague hint that deceased by an unsup- ported and remote possibility may have shot himself. He describes no position of the pistol which deceased had that would lend color to that contention; on the contrary, he at the time, according to his own testimony, had the muzzle of the pistol of deceased in one of his hands, and to hold that such testimony would authorize a reversal of the judgment on the ground that it was sufficient to sup- port the theory of accidental shooting so as to call for an instruction upon that issue, would be but trifling with justice and would tend to justly bring the administration of the criminal law into disrepute. We are unwilling to give our endorsement to it, and hold that the evidence relied on in support of it did not do so ''to any reasonable degree,'' and that the court did not err in failing to give the instruction contended for.

Finding no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.