## Lawson v. Commonwealth.

(Decided January 17, 1928.)

### Appeal from Whitley Circuit Court.

1. Homicide.—In prosecution for murder, verdict of jury, convicting defendant, cannot be disturbed, unless it is palpably against the evidence.

2.  Homicide.—In prosecution for murder, verdict of jury convicting defendant cannot be disturbed, merely because credibility of witnesses is attacked.

3.  Homicide.—In prosecution for murder, questions as to extent of defendant's drunkenness and frame of mind, and whether he committed act as claimed by state, held for jury.

4.  Homicide.—In prosecution for murder, evidence showing defendant, while drunk, approached deceased's home during night and shot him, and that defendant was identified by deceased's wife, did not show conviction for wilful murder was palpably against evidence, sufficient to authorize reversal by Court of Appeals.

5.  Criminal Law.—In prosecution for murder, requested instruction that, if defendant was so drunk at time of shooting that he did not possess malice or intent to commit murder, jury should consider intoxication on question of intent, and could not find defendant guilty of willful murder, held properly refused, where there was no allegation or proof of insanity, but evidence merely presented case of voluntary drunkenness, with its usual incidents.

6.  Criminal Law.—In prosecution for murder, court was not required to order sheriff, introducing pistol of defendant, to shoot pistol, so as to show whether shells coming therefrom were dented as were shells found near homicide, though permission to have the experiment made could be given defendant.

TYE, SILER, GILLIS & SILER, T. F. YOUNG and J. B. WALL for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Affirming.

Appellant was indicted in the Whitley circuit court for the willful murder of John Stansberry. On the trial of the case he was found guilty, and his punishment fixed at death. He appeals.

The chief ground relied on for reversal is that the verdict is not sustained by the evidence and should not be permitted to stand. The facts shown by the commonwealth are these:

John Stansberry lived with his wife and daughter in the southern part of Corbin, nearly a mile from the business part of the city. He was killed on July 29, 1926. He and his family had gone to bed about 9 o'clock. About midnight they were awakened by some one knocking at the door. The daughter was sleeping in a room near the front door. The father and mother were sleeping in a room back of this. Mrs. Stansberry awoke, and went out

in the hall, and asked who it was. The upper part of the front door was glass and she saw a man at the door. He made no answer. She told him to. get away, but he did not leave. By this time her husband came out, went to the door, and unlocked it, and asked the man what he was doing there; he did not say anything, and her husband told him to get away. Some words passed, which she did not hear distinctly. Finally the man started, and got to the edge of the porch. After some more talk, he started on down the steps, and when he got to the street turned south. She called to her husband to come in and call the police; he was standing on the edge of the porch, and was just turning, like he was starting to come in, when she stepped into her daughter's room. Then she heard the shooting; her husband came right on in, and fell just inside of the door. He died in a few minutes, without saying anything. He had not gotten off the porch; he had a pistol in his hand when he went out, but the pistol was lying by him, and had not been discharged, after he fell. The porch was about 4 feet above the level of the street. She testified that the street lights were close enough that she could see the person on the porch, and that she did see him well enough to recognize him afterwards, and she identified the defendant as the man that she saw. Six shots were fired by the man; two of them took effect in Stansberry's person, and four in the house. They were fired very rapidly, and apparently from the same pistol. The daughter, who was 19 years old, said that she did not get out of bed until the shooting occurred; that then her mother screamed, and she went to her father, who was lying on the floor just inside of the front door. Her mother went to the bathroom to get a towel, as her father was bleeding profusely; that she by phone called the doctor, and some one came to the door; that she asked who it was. He said "It's Red." The door was shut; the mother had shut it after the father fell. She looked at the man through the glass; he was standing close to the door; she was against the door, and raised the curtain, and looked out. She also positively identified the defendant as the man she saw at the door.

After supper that evening the defendant, who was known in the community as "Red" Lawson, and lived about three squares south of Stansberry's house, went up town with his pistol to a pool room. When he got

there, he gave his pistol to the keeper, and after this man had kept it awhile he came and got it and went out with it; finally he came back, and himself put it behind the counter again. He stayed around there until about 11 o'clock. He was quite drunk. Finally he proposed to some men there to go down to Gilbert Woods' and have a game. Gilbert Woods' house was next door to Stansberry's and it was a place where gambing was allowed. After making an arrangement with another to meet him at Gilbert Woods' and have a game, the defendant started down in that direction. He was warned by some one not to carry his pistol, that the police might arrest him, but said he would kill the police or anybody else that bothered him. A few minutes after the shooting, Gilbert Woods was standing in front of his house. The defendant came along and Woods, seeing that he was drunk, insisted that he should go home, and went home with him. After they had gone about two squares, the defendant stopped and loaded his pistol. He then went on home and went in, and Woods returned to his house. By this time quite a number of people had gathered there, including some officers, and very soon afterwards the defendant joined the crowd. When he got there, the officers arrested him, possibly on information they had obtained from Miss Stansberry. When he was arrested they took his pistol away from him, and they all testified that the pistol showed that it had been fired very recently, as the smell of the smoke was still in the barrel. The next morning, about light, a man looked around the premises, and found, near the point indicated by Mrs. Stansberry as the place from which the shots were fired, four empty shells. These were the shells of a 32 pistol, and such was the pistol of the defendant. Some one also found that morning, near where the defendant had stopped to load his pistol the night before, two loaded shells of the same caliber.

On the other hand, the defendant testified that the shooting occurred as he went along, before he reached Woods' house, and that, when he got to Woods', Woods took him home, and that he knew nothing about the shooting at all. There was no evidence of any bad feeling between the defendant and Stansberry, and no motive is shown, unless it may be inferred from the evidence that he took Stansberry's house for Woods' house, and shot Stansberry because he was mad because, as he thought,

Woods would not let him come in. The defendant also introduced proof tending to show that the street lights were obstructed by a vine on the porch on one side, and on the other by the corner of the building, so that it was dark at the door and a man could not be recognized there. Neither Mrs. Stansberry nor Miss Stansberry stated any particular facts by which they recognized the defendant as the man on the porch; but they did say that they recognized him as the man. The defendant introduced proof showing that two men in a car were seen going down that street, and that this car, just after the shooting, was seen going out of town rapidly. There was some effort also to show that all the shells were not shot from the same pistol, but the proof on this subject was not satisfactory.

It is well settled that the verdict of the jury cannot be disturbed, in cases like this, unless it is palpably against the evidence. The Constitution has fixed the tribunal for trying the facts, and the decision of this tribunal cannot be disturbed merely on the credibility of the witnesses. The jury sees and hears the witnesses. They know local conditions, and much that occurs before them is really not shown by the transcript of evidence. If the defendant was as drunk as the evidence of the commonwealth shows, and in the frame of mind that he was, as shown by these witnesses, he might reasonably have done everything that the proof for the commonwealth shows, and this was a question for the jury. Some tribunal must finally pass on this question. A jury of 12 men is peculiarly qualified for such a purpose, and this court cannot disturb · the finding of the jury, unless palpably against the evidence. That is not the case.

The defendant moved the court to instruct the jury that:

"If they believed from the evidence beyond a reasonable doubt that the defendant shot and killed John Stansberry, and if they believed from the evidence that at the time he did so he was drunk, or under the influence of intoxicating liquor to such an extent that he did not possess malice towards said Stansberry, or the intent to commit murder, the jury should consider such intoxication as bearing upon the question of the intent of said defendant in so shooting said Stansberry, and they could not find the defendant guilty of willful murder."

The court refused to give the instruction, or any instructions on the subject, except the usual instruction on murder, manslaughter, reasonable doubt, etc. In Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509, this court, after a careful review of the authorities on the subject, thus stated its conclusion as to the effect of evidence of drunkenness on the part of the defendant at the time of the commission of the offense:

"The true province of such evidence, which is admissible as a part of the res gestæ, is to assist the jury in fixing the punishment in accordance with the extent voluntary drunkenness, considered a human frailty, influenced the perpetration of the malicious crime, at death or life imprisonment, but not to rebut malice and reduce the crime to manslaughter."

In Graham v. Commonwealth, 200 Ky. 161, 252 S. W. 1012, which is relied on by appellant, immediately following the words quoted by appellant's counsel are these words:

"While cases of homicide are to be found in which instructions advising the jury of the purpose for which voluntary drunkenness, though not excusing the crime, might be considered by them, it will be discovered that in these cases insanity was the defense relied on. Mathley v. Commonwealth, 120 Ky. 389 (86 S. W. 988, 27 Ky. Law Rep. 785); Wright v. Commonwealth (72 S. W. 340) 24 Ky. Law Rep. 838 (1838). On the other hand, it has been held in numerous cases that in the absence of a plea of insanity, the refusal to give such an instruction was not error."

In Perciful v. Commonwealth, 212 Ky. 674, 279 S. W. 1062, the court on like evidence gave the jury this instruction:

"The court further instructs the jury that, although they may believe from the evidence that the defendant, at the time of the killing of J. W. Rider, if he did do so, had not sufficient reason to know right from wrong, or was without sufficient power to govern his actions by reason of some impulse, which he could not resist or control, yet if they further believe from the evidence that such lack of reason to know right from wrong, or such insuffi-

cient will power to govern his actions, or to control his impulses, arose alone from voluntary drunkenness, then existing, and not from an unsoundness of mind, the jury should not acquit the defendant upon the grounds of insanity."

Affirming the judgment, and holding the instruction proper, the court said:

"The instruction simply gives effect to the salutary rule that temporary insanity, caused solely by voluntary drunkenness at the time of the homicide, does not exempt one from responsibility for his act. It does not purport to deal with settled insanity, produced by long-continued intoxication prior to the homicide. Under the facts of this case the instruction was peculiarly applicable and proper."

In Fleenor v. Commonwealth, 221 Ky. 175, 298 S. W. 376, the court, again reviewing the cases on the subject, said:

"The rule is well settled that, while the fact of drunkenness in a case like this may be a circumstance showing the absence of malice, it should not be singled out from the other proof, and the jury should not be instructed that it mitigates the offense. One in a state of voluntary intoxication is subject to the same rules of conduct and to the same rules and principles of law that a sober man is."

There is no evidence here of insanity; it is simply a case of voluntary drunkenness with its usual incidents. The instruction asked by the defendant was properly refused. The instructions of the court were as favorable to the defendant as he was entitled to.

The sheriff produced on the trial the pistol of the defendant. The defendant asked the court to order the sheriff to shoot the pistol, so as to show whether the shells coming out of the pistol were dented like the shells found on the sidewalk. The court was not required to order the sheriff to make experiments as a witness for the defendant, although he might properly give the defendant permission to have this experiment made. In fact, it appears that the experiment was made later by a man, at the request of the defendant, who testified on the trial, and no substantial right of the defendant was prejudiced by the action of the court.

Upon the careful consideration of the whole record, the court finds no error to the prejudice of the defendant's substantial rights.

Judgment affirmed    Whole court sitting.