## Stephens v. Commonwealth.

(Decided November 23, 1928.)

## Appeal from Christian Circuit Court.

1. Criminal Law.—Appellate court will interfere only when verdict is so palpably against evidence that it shocks sense of justice and compels conclusion that it was result, not of judgment, but of passion and prejudice.

2. Homicide.—In prosecution for murder, evidence held sufficient to support conviction.

3. Homicide.—In murder prosecution, instruction on manslaughter or shooting in sudden affray held properly refused, where only evi- dence which defendant claimed entitled him to such instruction was to effect that witness left his factory when he heard first shot and saw two men engaged in struggle before second shot was fired.

4. Criminal Law.—Instruction cannot be founded on mere suspicion, but there must be some evidence on which to base instruction.

5. Criminal Law.—Defendant held not entitled to new murder trial on ground of newly discovered evidence, where newly discovered evidence tended only to impeach state's witnesses' testimony; no surprise being shown.

6. Criminal Law.—Ground for new trial not discussed in brief will be treated as waived on appeal.

JAMES E. HIGGINS for appellant.

J. W. CAMMACK, Attorney General, S. H. BROWN, Assistant At- torney General, ALVAN H. CLARK, C. H. BUSH, WHITE & CLARK and John T. KING for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

Upon his separate trial under an indictment charg- ing him and three others with the murder of S. W. R. Faulkner, Willie Stephens was found guilty and his pun- ishment fixed at life imprisonment. His motion for a new trial was overruled, he excepted, and has appealed.

He filed ten different grounds upon which he asked a new trial, but as the principal ground is that he was entitled to a peremptory instruction and that the verdict is flagrantly against the evidence, we shall discuss that one first, and to do so it becomes necessary to state briefly the proof against him.

Faulkner kept a service station in Hopkinsville, Ky., and on the evening of Sunday, August 17, 1924, he was at his station and in charge thereof. One Monhollern and

wife drove up to this station about 10 o'clock to get oil, gas, and water, and Mr. Faulkner waited on them. While he was doing so, the attention of these travelers was attracted by the unusual and suspicious conduct of some men in the neighborhood. They knew none of them. They said one of them was dressed in a blue overall suit and topped off by a large western hat. Another had on a khaki shirt, while a third had on black trousers and white shirt. They said nothing of their suspicions and drove away. Shortly after they left, Faulkner closed his place of business, turned out the lights, and just as he turned around, after locking the door, a man thrust a pistol against his abdomen and ordered him to put up his hands. He did so, whereupon the man shot him, then robbed him and ran. The neighborhood was aroused by the shooting, and soon Faulkner's condition was discovered. He was picked up and taken to a hospital, where he was operated on. Before the operation he insisted on talking to his son-in-law, and his son-in-law testified that this was the substance of the conversation: He said he wanted to talk to me; that he was going to die, and insisted on talking to me before the operation. He said, "I am shot twice and cannot live." He said he had checked up his cash register, locked it, put the money in his pocket, put on his overcoat, and walked out the door, locked it, and when he turned around a man was standing there, who put a pistol against his stomach and told him to put up his hands; that he put them up and asked the man not to shoot him, but he shot him anyway. Whereupon he said, "You have killed me, don't shoot me any more." Whereupon his assailant shot him a second time. That he fell, and the fellow went through his pockets, took from him his money and a pistol that belonged to Tandy McGee. He said that this man had on a khaki shirt, had a red handkerchief over his face, and a light colored hat pulled over his face; that he was about 5½ feet tall and would weigh about 160 pounds. His son-in-law asked him if it could have been a negro, and the old man answered, "If he was, he was as white as a white man." Faulkner was shot about 10:30 in the evening. Faulkner did not recover from the operation, and died about 36 hours after he was shot, without regaining consciousness after that.

A man named Major was at work that night at an ice cream factory not far from the service station. His

attention was attracted by a shot. He went out and saw two men struggling with each other in front of the service station. One of them he subsequently learned was Faulkner. The other man had Faulkner by the hand or had hold of something that Faulkner had in his hand. He heard Faulkner ask him, "Please don't shoot me," whereupon the other shot Faulkner again. This witness was unable to give any description of Faulkner's assailant.

Another witness who lived on the corner of Sixth and Liberty streets, diagonally across from the service station, heard the first shot, then heard Faulkner scream that he was shot and was going to die, or something like that. Then he heard a second shot. By that time this witness had got outside his house, and he saw a man in a khaki colored shirt, which the witness described as a brown uniform shirt, running east on Sixth street in the direction of the railroad, and that this man was a slender man about 5 feet 7 or 8 inches tall.

Another man who lived on the corner of Fifth and Liberty heard a shot. He came out and saw a man running north on Liberty street in the direction of Fourth street, and heard Faulkner cry out. He paid no attention to the man's clothes, and could not tell whether it was a white or colored man, but said he would weigh about 150 or 160 pounds and was running fast.

A woman who lived on Sixth street between Liberty and Clay heard these shots. After the second shot was fired, she went out on her porch, and she saw two men running east on Clay street toward the Louisville & Nashville Railroad. She said that they had on dark clothes. She said they were either white men or very bright mulattoes.

A man who lived on Sixth street heard two pistol shots and he went out. He saw a colored boy riding a bicycle and saw a stooped shouldered man run east on Sixth street. The boy fell off the bicycle and ran up the street. The stoop shouldered man soon passed him, and the boy came back, got on his bicycle and rode away. Shortly after that he heard a Ford car start up. He thought this Ford car was somewhere near Sixth and Clay.

Another witness saw a Ford car with the top back coming south on Campbell street and turn north on Ninth street. This witness said Willie Stephens was driving

this car, that he had on a khaki shirt and cap, and that the man on the front seat with him had on a big Texas hat. He was unable to describe the two men in the rear seat. The witness saw this car a few minutes after the shooting.

A Mr. Flood, who ran a service station at Springfield, Tenn., testified that about 1 o'clock that night four men, traveling in a Ford car with the top back, stopped at his station and pawned a flashlight to him for $1, that their engine was hot, and that they explained to him they had driven from Hopkinsville in two hours and a half. Out of this dollar they got 80 cents worth of gas and oil and started in the direction of Nashville. It is admitted Willie Stephens, Orville Martin, "Humpie" Ashworth, and Tommy Stephens stopped at Flood's service station that night in Springfield and pawned a flashlight, got some oil and gas, but defendant claims that this occurred about 11 o'clock. They admit that they went to Nashville, and insist that they got to Nashville between 12:30 and 1 o'clock. They went to the home of one Alex Meadows, a cousin of Willie Stephens, and at that place there was Jodie Stephens, a brother of defendant, and Jodie's wife and the defendant's mother. Some of the women fixed a meal for these fellows, and after eating it they lay down on the floor and went to sleep. The next morning they returned from Nashville to Hopkinsville and brought with them the defendant's mother and a boy that, it seems, was a friend of the family. On the way back, they stopped at Flood's service station and got the flashlight, which they had pawned the night before; but they omitted to pay the dollar they had borrowed on it. They got back to Hopkinsville about 12 o'clock and had started out to Jim Ford's. They met Ford and his wife in a buggy, and with them in the buggy was a Miss Sue Henry. Stephens and his party were hungry, and it was suggested that Sue Henry return to Ford's home and fix them some dinner. She said there was no flour there, but Stephens said he would get some flour, and on their way back to the Ford home they stopped at a grocery, where he bought a small sack of flour, some pepper, and some other things. The commonwealth proved that before leaving Hopkinsville, Stephens had no money, and he borrowed $1 on the flashlight and, after getting this gas and oil, had 20 cents left. Just before the party got to Nashville, Stephens says they spent this 20 cents for

four hamburgers. He claims that when he was in Nashville he traded automobile cushions with his cousin, Alex Meadows, and got $2.50 to boot. Out of that he says he bought the necessary oil and gas for his return trip to Hopkinsville, and spent $1.15 for the flour, pepper, etc. To those of us who have driven automobiles, it would appear that if he were able out of $1.35, which he had left out of this $2.50, to buy the necessary supplies to bring a Ford automobile laden with six people from Nashville to Hopkinsville, he is a very clever financier; but when we read the evidence of Sue Henry, in which she says that at the time Stephens paid for this flour, pepper, etc., he paid for it in greenbacks, and that he had a roll of money, things look differently.

It was more than three years before the grand jury indicted this quartette for the murder of Mr. Faulkner. In the meantime, Stephens had been arrested once or twice, charged with the crime, but each time was discharged because of lack of evidence to hold him. He perhaps grew bold because of his success, and the witness Lonnie Gibbs says that in July, 1926, he had a conversation with Willie Stephens near what is known as the Seven Mile Ferry at Clarksville. He testified that he asked Stephens "how he got by without working." Stephens called his attention to the whiteness of his hands and their tenderness, and said they were not scarred up with work and never would be. He said:

> "You remember what happened here in Hopkinsville a while back? Do you remember that fellow Faulkner got killed at the filling station? Me and Martin did that. We had a car parked close to an old factory at the L. & N. R. R., and as soon as the shooting was over, we eased the man down and got his money, ran to the car and on our way met a boy on a bicycle who got scared and fell off, we got in the car and went to Nashville and made it so quick that we could prove by a man in Springfield that we were there at the time the shooting took place."

This witness said Stephens told him they pawned a flashlight at Springfield, so that if anything came up it would keep people from thinking he had money. The witness said he cautioned Stephens about talking so, and that Stephens said he had been tried for it twice and that he was "too damn sharp for them in Hopkinsville."

Another witness, Henry Gibbs, testified that on one occasion he was with Stephens, and they bought some whisky and drank it together, and on that convival occasion Stephens said to him that he had lived the average life of a man and that if he got killed he would not lose much. The witness testified that he then said to Stephens, "You ought to behave yourself and quit drinking." Stephens said, "I don't care, you remember that Faulkner that got killed in Hopkinsville?" and the witness replied, "I have heard a little about it, not much." Stephens then said that he and Orville Martin had killed that fellow and left him under the shed at the station and made a getaway.

Of course, Stephens and all of his witnesses dispute these things, and Stephens argues now that this verdict was contrary to the law and evidence and was the result of passion and prejudice on the part of the jury; but we have written in the recent case of Brown v. Com., 226 Ky. 255, 10 S. W. (2d)—, decided November 13:

"It is only when the verdict is so palpably against the evidence that it shocks the sense of justice and compels the conclusion that it was the result, not of judgment, but of passion and prejudice, that this court will interfere."

After reading from this record the things we have set out above, and then reading the verdict in this case, our sense of justice is not shocked except by the mildness of the punishment, and as this is the ground for reversal to which Stephens has addressed the major part of his argument, and since his defense is an alibi, this is about all that Stephens has to discuss. However, he contends that he was entitled to an instruction on manslaughter or shooting in sudden affray. The defendant took the stand and testified in his own behalf, steadfastly adhering to his contention that he was not in Hopkinsville at the time of the shooting. Thus there was no evidence coming from him on which such an instruction could have been based, and the commonwealth certainly introduced no evidence to warrant the submission of a manslaughter instruction to the jury. Indeed, the only evidence that Stephens claims entitles him to a manslaughter instruction is that of the witness Major, who left his ice cream factory when he heard the first shot, and who saw two men engaged in a struggle in front of the service station

before the second shot was fired. Instructions cannot be founded on mere suspicion. There must be some evidence on which to base an instruction, and there is not in this case the slightest evidence that this was anything but a murder, perpetrated for the purpose of enabling the perpetrator to commit a robbery.

Stephens is contending that he was entitled to a new trial because he has since this trial learned that he could prove by H. C. Walker, the sheriff, and H. T. Cook and W. T. Perry, constables of Montgomery county, Tenn., that they were acquainted with the general reputation of Lonnie and Henry Gibbs for truth and veracity and that it was bad, that both of them have criminal records in Montgomery county, and that Lonnie Gibbs was, shortly after his trial, a fugitive from justice. Thus it will be seen that this newly discovered evidence, if he had it, would to the extent it is admissible only tend to impeach the evidence of these Gibbs boys, and we have often written that newly discovered evidence which tends only to impeach a witness does not except in rare cases authorize a new trial. Stephens says the evidence of Henry Gibbs and Lonnie Gibbs was untrue, that it came as a surprise to him, that he could not anticipate it, and was wholly unprepared to meet it. However, the record discloses this case was, on October 14, 1927, set for trial on March 3, 1928. When this case was set the commonwealth announced it desired the attendance as a witness of Henry Gibbs of Clarksville, Tenn., and upon the motion of the commonwealth there was included, in this order setting this case for trial, an order for the attendance of Henry Gibbs as a witness, and an order for the payment of his traveling expenses from Clarksville to Hopkinsville. Thus Stephens had the same opportunity to learn Henry Gibbs would be used as a witness against him that he had to learn when this case would be tried. With this knowledge, it behooved him to prepare to meet the evidence of Henry Gibbs. If he had prepared himself to meet the evidence of Henry Gibbs, then he would also have been prepared to meet the evidence of Lonnie, because the witnesses by whom he now proposes to impeach Henry are the same witnesses by whom he proposes to impeach Lonnie. Thus preparation for one would have been preparation for the other, and we have already said he had notice that he must be prepared for Henry. This trial was concluded on March 7. He discovered these new witnesses

by whom he now proposes to impeach Henry and Lonnie and secured their affidavits on April 3, and it seems to us if he had used half as much diligence before the trial as he displayed afterwards, that it would have resulted in the discovery of these witnesses sooner.

The other grounds upon which he asked a new trial are made in a perfunctory manner. He has not discussed them in his brief, and we shall treat them as waived.

The judgment is affirmed.