## Cline v. Commonwealth.
(Decided April 21, 1933.)

610

RAY O. SHEHAN and T. R. McBRAYER for appellant.
BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 8:30 p. m., on November 19, 1932, appellant and defendant below, Raymond Cline, shot and killed Hugh Rickard in front of defendant's residence in Lynch, Harlan county, Ky. He was afterwards indicted and charged with murder, and at his trial thereunder he was convicted and punished by confinement in the penitentiary for life. On this appeal from the verdict, after his motion for a new trial was overruled, and from the judgment thereon, his counsel argue but one ground as prejudicial error authorizing a reversal of the judgment and the granting of a new trial, and which is: That the court erred in failing and refusing to submit to the jury the issue of defendant's sanity at the time of the killing. There was no motion by defendant's counsel for such instruction, but under the universal rule that it is the duty of the court in criminal causes to give to the jury the entire law applicable to the case, the failure to move for such an instruction creates no waiver of defendant's right thereto, if the evidence introduced at the trial authorized it. So that, the sole question for determination is: Whether the record contains sufficient evidence to authorize the submission to the jury of that issue?

Deceased had formerly boarded with defendant at his residence in Lynch, but had ceased to do so for some time prior to the homicide and he had moved to the town of Cumberland, where he had engaged, accord-

ing to the witnesses, in the "feed store" business, and was operating it at the time he was killed. A sister of defendant's wife (Cleo Wood) lived at his home, but she had been away for a short while prior to the killing, and on the night it occurred deceased and two other young men were about to start on a trip from Cumberland to Lynch to be made in a one-seated automobile belonging to decedent, with a rumble seat at the rear. The three learned in some way that Miss Wood desired to return to the home of her brother-in-law in Lynch and agreed to take her along, she occupying the front seat with deceased, who drove the car, and the two young men occupying the rumble seat. They drove up in front of the residence of defendant, which was some thirty feet from the sidewalk or street, and Miss Wood alighted and had about started up the steps from the sidewalk when she was met by appellant, who was in his shirt sleeves and had a pistol, but which she did not see when she met him. He went to the side of the automobile opposite deceased, who was still occupying the driver's seat, and said to him, according to the witnesses in the rumble seat: "Hugh, you damned s—— of a b——, as low down and as big a coward as you, I don't want you stopping in front of my door." Deceased replied: "Go on Nick (which was a name by which defendant was known) I don't want any trouble." And defendant then drew his pistol with his right hand from his hip pocket and punched the deceased with it, the latter throwing up his hands, and then defendant fired five shots into his head, killing him instantly. The substance of the above testimony was given by both occupants of the rumble seat and in its main features was corroborated by Miss Wood, the sister-in-law of defendant.

In giving his account of what occurred at the immediate time of the killing, defendant testified that he knew before he reached the automobile that the deceased was one of its occupants and that when he got there he said: "Hugh, drive away from my plant, I don't want any trouble, I have asked you to stay away." When deceased said: "This is a God Damn free country. I will do as I please," and threw his hand to his right hip pocket, when defendant commenced firing at him and emptied his pistol without ceasing. He testified that about one week prior to the killing, his wife had informed him that deceased had

mistreated her, ''and when I come in she told me about it, told me he had mistreated her, and what was said and done.'' He was then asked what effect that had on him, and he answered: ''It certainly bothered me.'' He then stated that on the Wednesday following, which was three days after he became possessed of that alleged information, he consulted an attorney and, perhaps, the county judge, as to what should be done, and they advised him to talk with deceased about it, which he attempted to do by calling at the place of business of deceased where, according to him, he said: ''Hugh, what right do you have up at my house mistreating my wife?'' When deceased answered: ''I guess I have a right to, and God Damn you get out of my place and stay out.'' He, furthermore, stated that the alleged information imparted to him by his wife made him both angry and nervous to such an extent that it interfered with his sound sleeping; but he nowhere stated that, whatever mental disturbance he suffered, it interfered in the least with the normal activities of his mind, or caused him to take any action or engage in any conduct of an abnormal nature. Neither did he claim in his testimony that he did not know what he was doing at the time he was shooting deceased, but attempted to excuse it solely and only upon the ground of his right to defend himself from legally apprehended danger from the hands of deceased.

We have stated, in substance, all of the evidence contained in the record upon which the sole argument in brief is based. Many cases are cited therein in which this court has defined the measure of mental responsibility for the commission of crime, as well as irresponsibility therefor, and which latter in the case of Abbott v. Commonwealth, 107 Ky. 624, 55 S. W. 196, 198, 21 Ky. Law Rep. 1372, is thus stated: ''Without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong, or that, as the result of mental unsoundness, he had not then sufficient will power to govern his actions, by reason of some insane impulse which he could not resist.'' To the same effect is the case of Thompson v. Commonwealth, 155 Ky. 333, 159 S. W. 829, and many others following it, up to the present time, there being none to the contrary.

Defendant at the time of the trial, and when he testified, did not claim that his mind was then in the least impaired, and he nowhere stated in his testimony

that he was at the time of the killing mentally affected in any of the ways that would excuse him from responsibility for his crime as contained in the opinions, supra, of this court, and of all other courts and textwriters. It, perhaps, might be truthfully said, concerning every perpetrator of a crime, that at the immediate moment of the commission thereof he was not in perfect normal mental condition, but we have yet to learn that such slight disturbances from normal mental conditions of a sane person create that degree of insanity which the law recognizes as an excuse for crime. It is therefore clear that there was no evidence in this case upon which an instruction on insanity could be based, the rule being that a court is not required to submit an issue to a jury in the absence of evidence to support it, and which is as applicable in criminal prosecutions as in civil trials. Stephens v. Commonwealth, 226 Ky. 437, 11 S. W. (2d) 111; King v. Commonwealth, 187 Ky. 782, 220 S. W. 755; Daniel v. Commonwealth, 198 Ky. 158, 248 S. W. 511; Anderson v. Commonwealth, 144 Ky. 215, 137 S. W. 1063; Commonwealth v. Clark, 200 Ky. 358, 254 S. W. 1051; Lawson v. Commonwealth, 222 Ky. 614, 1 S. W. (2d) 1060.

The evidence is overwhelming in this case that defendant maliciously shot and killed the deceased to avenge some imaginary but unstated wrong done by him to the former's wife, and the urged instruction on insanity was evidently sought for the purpose of exploiting before the jury defendant's alleged rights under the disapproved doctrine of the "unwritten law." Such conditions, if they exist, might be accepted by the jury in reducing the magnitude of the crime from murder to voluntary manslaughter, but human life is too sacred for the law to adopt the principle that the unwritten law shall excuse the offender from the consequences of his crime, and neither this nor any other court, so far as we are aware, has ever so declared.

Finding no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.