# Martin v. Commonwealth.

(Decided December 18, 1917.)

## Appeal from Spencer Circuit Court.

1. Criminal Law—Evidence—Weight and Sufficiency of for Jury.—
We have written in many cases that we will not interfere with the
verdict of a properly instructed jury on a question of fact, un-
less it is so flagrantly against the weight of the evidence as to ap-
pear at first blush that the jury in making it were influenced by
passion or prejudice.

2. Criminal Law—New Trial—Misconduct of Counsel or Jury.—The
affidavit of counsel for the defendant in a criminal prosecution,
based on the alleged statement made to them by the sheriff in
charge of the jury as to what the verdict would be and based on
the alleged fact that the sheriff said he had furnished the jury
with whiskey during the trial, will not be sufficient to authorize the
granting of a new trial when it is contradicted by the affidavit
of the sheriff and all the jurors and is unsupported by other facts
or circumstances.

WILLIS, TODD & BOND for appellant.

CHARLES H. MORRIS, Attorney General, and D. O. MYATT, As-
sistant Attorney General, for appellee

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Ashton Martin, who is shown by un-
contradicted evidence to be a man of bad character, was
found guilty under an indictment charging him with the
murder of Frank Dulin, and his punishment fixed at im-
prisonment in the state penitentiary for ten years. On
this appeal it is urged as grounds for reversal: (1) that
the verdict of the jury was flagrantly against the evi-
dence; (2) that the deputy sheriff in charge of the jury
was guilty of misconduct; and (3) that the jury, or at
least some of them, were guilty of misconduct.

The evidence shows substantially the following facts:
The sheriff of Spencer county had warrants for the
arrest of one Tom Snider and Minor Martin, a brother
of Ashton Martin, who were charged with shooting the
father-in-law of Minor Martin. Under these warrants
the sheriff arrested Snider, and it further appears that
after this he or some of his deputies attempted on one
or more occasions to find Minor Martin, but did not do so.

After the warrant for the arrest of Minor Martin
had been in the hands of the sheriff for some time, he

gave it to Frank Dulin, one of his deputies, to execute, and when Dulin went to the house of Martin to arrest him, he found Martin at home, who, when he discovered Dulin, ran out of the house, and after going a short dis- tance fell and Dulin caught him, but before he took him in custody Dulin fired one shot from his pistol while Martin was running. After arresting Martin, and while he had him in custody and was on his way with him to a public road, the appellant, Ashton Martin, who says that he was out squirrel hunting on this very dry day soon after dinner, appeared upon the scene.

Ashton Martin tells what then happened in this way: "I went right back down the same way. I went down the hollow, down the road, and when I got up to the corner of the orchard my little sister and brother met me there. They was just playing down the road. They was talking coming right down at the house, just about the upper edge of the house; best I recollect it was about the upper edge of the house. I seen some fellow looking up out there. He fired a pistol there. He had the pistol this way and jumped around and he fired again. Q. When he fired that shot, did you know who he was? A. No, sir; I didn't, not at that time. I knew it afterwards. Q. Who was with this man that fired? A. My brother. Q. Minor? A. Yes, sir. Q. Well, then, go ahead. A. So I dropped my gun and finally stooped down. Q. You say he fired? In what direction did he fire? A. Fired at me. The first shot went through my breeches, come out down here, and burnt my leg. That is what caused me to drop the gun; it scared me; I didn't know what it meant. He fired the second shot. As he fired the second shot I reached down and grabbed the gun, and as I come up with it he fired again. He fired the third shot. The third one went right by my ear and played a tune. Q. What did you do? A. When he fired the third shot, then I fired. Q. Then what happened? A. Then he turned around in an opposite position and fired as he went around and staggered off towards the creek, when he fell."

Minor Martin describes the tragedy as follows: "We had gotten down in front of my father's, crossed the creek there by that sycamore tree, up above it about four or five feet, right on a little rise; just above the little syca- more tree this man (Dulin) jumped out in front of me and shot; then I jumped back, and he turned me loose. Q. When he jumped out in front of you and began shoot- ing, did you know what he was shooting at; did you see anybody? A. Yes, sir; just as he jumped out in front -

of me I saw my brother over the fence there. Q. Where was he? A. Over in the road. Q. Was there a fence between where you and Mr. Dulin was standing and where your brother was? A. Yes, sir. Q. What kind of a fence? A. Wire fence. Q. Now how far would you say your brother was from Mr. Dulin at the time Mr. Dulin jumped out, as you have indicated, and began shooting? A. My best judgment he was about thirty-five or forty feet; maybe forty-five feet. Q. Just tell who shot first and how many shots were fired. A. Mr. Dulin shot first, and he shot three times before my brother raised and shot him. Q. Just tell what occurred after the first shot. A. My brother looked like he dropped down, looked like he dropped his gun, kinder dropped back. Q. Then what happened? A. Well, he shot twice more, and my brother raised and shot him. The man kinder turned around. I was standing on this side of him. The man come around—just say he was standing this way, just down below me when my brother shot him, and he was standing this way with the gun pointing toward my brother, when he was shooting at him; he come around on this side that way. Just as he come around he evidently fell and staggered toward the creek.''

The evidence of these witnesses is substantially corroborated by Gilbert Martin, a brother, and Mrs. Snider, an aunt of Ashton Martin, who say they were nearby at the time of the shooting.

It will thus be seen that according to the evidence of these witnesses, Martin shot Dulin in self-defense and to prevent him from killing or doing him serious harm, and did not shoot until after Dulin had fired three shots at him.

The record does not furnish any motive or reason why Dulin should have commenced the attack on Ashton Martin as soon as he discovered his presence and before Ashton Martin had said or done anything that could have influenced him to try to kill him.

The theory of the Commonwealth is that Ashton Martin, who, as we have said, was a man of bad reputation, at the time he fired the shot, was secreted in some undergrowth and shot and killed Dulin pursuant to his threat that no man could arrest his brother and take him away if he was about; that when Dulin discovered the presence of Ashton Martin, Martin was in the act of shooting him, and thereupon Dulin drew his pistol and fired, after Martin had fired the first shot at him, or about the same time.

This theory is supported by the evidence of Gus Yates, who said that some time before this, and after a warrant had been issued for the arrest of Minor Martin, he heard Ashton Martin say that "there couldn't no one man come and arrest Minor and take him away where he was at."

John Cook, another witness, heard Ashton Martin say that "there wasn't any need for any one man to come and arrest him."

Charles Shafer, who was one of the deputy sheriffs who assisted in arresting Tom Snider, said that while he was at Snider's house Ashton came running in and wanted to know what was the matter, and he told him that Minor Martin and Tom Snider had shot Theodore Temple; that then Ashton Martin said "they could come up there and arrest him (Minor Martin), but he be damned if they could take him away from there."

James Stodghill, who was two or three hundred yards from where the killing took place, but did not see it, heard the shots, and testified that he heard about five shots. "They were all fired so quick together I could not say. There was one gun shot and the others appeared to be pistol shots." But he could not say whether the gun or the pistol shots were fired first, although he did state that they were fired in quick succession.

Sam McClain, who was near by, did not see the parties, but heard the shooting and testified that he heard five shots; that one of these from a pistol and one from a shotgun were fired almost together, and that these two were followed by three pistol shots in rapid succession; that the first pistol shot and the gun shot were fired at the same time, and he was sure that the gun shot was either first or second.

So far as the weight of the direct evidence is concerned, it must be conceded that it supports the theory advanced by the defense that Ashton Martin did not shoot until after Dulin had fired three shots at him, but it should further be kept in mind that the credibility of this theory depends very largely on the fact that Ashton Martin did not shoot until after three shots had been fired at him, and this vital fact is contradicted by the evidence of Stodghill as well as of McClain, who said that the gun shot and the first pistol shot were fired simultaneously and the other pistol shots followed afterwards in quick succession. Under these circumstances it was for the jury to weigh this conflicting evidence and decide

for themselves whether Martin shot and killed Dulin in self-defense.

In determining this question the jury had the right to, and we have no doubt did, consider the bad reputation of Martin, the threats that he had made, the improbability that he was out hunting squirrels shortly after dinner on a dry day, the further fact that the witnesses in his behalf were his brothers and his aunt, and the inherently unreasonable story that an officer, without the slightest provocation or excuse, would deliberately commence firing at a man quietly walking in a public road, against whom he had no grievance and whom he scarcely knew, the moment he discovered his presence and before the man had said or done anything to excite his alarm or his anger. At any rate, we have written in many cases that we will not interfere with the verdict of a properly instructed jury, such as this was, on a question of fact, unless it is so flagrantly against the evidence as to appear at first blush that the jury in making it were influenced by passion or prejudice, and there is no showing in this record that the jury were influenced by either the one or the other, and there is sufficient circumstantial evidence to sustain the finding af the jury.

Another ground urged for reversal is the alleged misconduct of the deputy sheriff who had charge of the jury, and the alleged misconduct of the jury.

On the motion for a new trial the attorneys for Martin filed affidavits stating that while the jury were in the custody of the deputy sheriff, John Thomas, he said he had given them whiskey, and also said, "that the jury would not hang, in his opinion, but would make a verdict of conviction." Thomas denied in an affidavit that he made these statements, and further said that "at no time did any member of the jury express any opinion or speak in any way whatever about the trial in his presence or hearing," and that he did not furnish any whiskey to any of the jurors, nor did any persons else, within his knowledge, except that during the trial four of the jurors were suffering from diarrhea, and after taking some medicine which proved ineffectual to relieve this trouble, he, at the request of one of these jurors, and in an effort to relieve the ailment from which they were suffering, took a small quantity of whiskey to the jury room, and each of these four men took one drink of whiskey in the presence of the other jurors, but that no one of the other jurors had or took any whiskey during the trial. All of

the jurors subscribed to an affidavit corroborating fully the affidavit of Thomas.

The trial judge did not consider the affidavits of the attorneys sufficient grounds for setting aside the verdict, nor do we.

The judgment is affirmed.