## Fry v. Commonwealth.

(Decided May 14, 1935.)

338

HUBERT MEREDITH for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

In 1893, the Legislature enacted section 1159, Kentucky Statutes (Acts 1891-93, c. 182, p. 756, sec. 32), which fixed the punishment of the common-law crimes of robbery and burglary at confinement in the penitentiary at not less than two nor more than ten years. In 1904, it enacted section 1159a (Acts 1904, c. 43, p. 117), prescribing the punishment for same crimes, committed by the means of explosives or any other force, at not less than two nor more than twenty years at confinement in the penitentiary.

The act of 1934 (chapter 52) merely re-enacted section 1159. It re-enacted in its entirety section 1159a with this addition:

"That if any person shall commit acts of robbery, burglary as defined in sections 1159 or 1159a, robbery of bank or safe, and in committing said act or acts shall use or display any pistol, gun or other firearms or deadly weapon of any character in so doing; upon conviction such person shall be sentenced to death or life imprisonment in the discretion of the jury," etc.

The grand jury of Logan county indicted Richard Roe, alias Elmer Fry, under the latter clause of this section (1159a), charging that he had committed the crime of robbing a bank by "unlawfully, willfully and feloniously, and by force and violence and by the use and display of a deadly weapon, firearms, to-wit; a pistol." On a trial to a jury he was convicted and his punishment fixed at confinement in the state reformatory for the period of his natural life.

He is here urgently insisting that the title of the act is within the inhibition of section 51 of the State Constitution. The former reads:

"An Act to amend and re-enact Sections 1159 and 1159a, Carroll's Kentucky Statutes, prescribing punishment for robbery or burglary, robbery of bank or safe, or for having burglarious tools, the use of fire arms in committing any of said acts and knowingly giving protection or comfort to any person committing these acts." Acts 1934, c. 52.

The general rules for amending laws by title are so familiarly and generally known, it is unnecessary to reiterate them. For an accurate statement of them, see Board of Penitentiary Com'rs v. Spencer, 159 Ky. 255, 166 S. W. 1017. An examination of the title and the context of the act, in the light of the rules therein stated, is convincing that Fry's objection to the title is not meritorious.

He argues that the statute under which he stands convicted is within the prohibition of section 17 of our Bill of Rights. He does not dispute that the punishment by death or confinement in the penitentiary for life, in a proper case, is not "cruel punishment," within the prohibition of this section of our Bill of Rights, or within the Eighth Amendment to the Constitution of the United States; but he contends that the death penalty is excessive or cruel in view of the degree of the crime of which he is convicted.

Much difficulty has been expressed by the courts of the country in attempting to define the scope of these constitutional provisions. It is the thought of some that they are not a limitation of legislative discretion in determining the severity of punishment. Others view them as referring to the mode of the infliction of the punishment. Aldridge v. Com., 2 Va. Cas. (4 Va.) 447;

Commonwealth v. Hitchings, 5 Gray (Mass.) 482; Sturtevant v. Commonwealth, 158 Mass. 598, 33 N. E. 648; State v. Williams, 77 Mo. 310; Territory v. Ketchum, 10 N. M. 718, 65 P. 169, 55 L. R. A. 90; Commonwealth v. Evans, 33 Mass. (16 Pick.) 448; Wilkerson v. Utah, 99 U. S. 130, 25 L. Ed. 345; In re Kemmler, 136 U. S. 436, 10 S. Ct. 930, 34 L. Ed. 519.

Still others are of the thought they are broad enough to confer upon the courts the power to review legislative discretion concerning the adequacy of punishment. State v. Becker, 3 S. D. 29, 51 N. W. 1018; In re McDonald, 4 Wyo. 150, 33 P. 18; In re Bayard, 25 Hun (N. Y.) 546, 63 How. Prac. 73; Thomas v. Kinkead, 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am. St. Rep. 68; see, also, dissenting opinions of Justices Field, Harlan and Brewer in O'Neil v. Vermont, 144 U. S. 323, 12 S. Ct. 693, 36 L. Ed. 450.

We have adopted the rule that the fixing the penalties for crimes is a legislative function; and whatever constitutes an adequate punishment is a matter of legislative judgment and discretion. We have steadfastly declined to interfere therewith. Since the sentence here imposed is within the limits prescribed by the statute for the crime committed, we decline to accept the view it is cruel punishment. For the most recent statement of our views, see Crutchfield v. Commonwealth, 248 Ky. 704, 59 S. W. (2d) 983. With these questions disposed of, we are confronted with the difficult and perplexing one, Is the verdict against the evidence? To dispose of it requires a patient, careful, painstaking, and extended review and analysis of the evidence, which we shall now undertake.

Around 7:30 o'clock, Saturday morning, the 22d day of September, 1934, at Russellville, Logan county, Ky., as Tom Garrison finished "cleaning up" the interior of the Southern Deposit Bank and was going out the back door, two men approached and required him to get into the bank, they followed, where they "wired" his hands and feet, laid him in a hallway, face down, where he remained ten minutes, during which time they left him and on their return compelled him to arise, walk into the directors' room, where they, after placing tape over his mouth, laid him on a couch with his face to the wall. He identified the accused as one of the two men who did this. He testified that the one he identified as

the accused was wearing at the time a "cap" "blue shirt," "black shoes" and "solid colored pants." The man whom he identified as the accused, after he first entered the bank, put on "big, brown goggles." About five minutes of 8 o'clock, Lewis Richardson, cashier, entered the bank, when he discovered that the janitor was lying on the couch in the directors' room, his hands behind him, tied with wire. He walked ten or twelve feet from the front door, and as he started to go behind the counter Richardson heard a voice commanding him to put up his hands and be quiet; the man was behind him with a gun in his hand, and remained behind him "nearly all the time." At his command, Richardson entered the vault, made the electrical connection open the safe, and in about 15 minutes he opened it, secured $7,000, and placed it in a sack. He then compelled Richardson to lie on his back in the floor and wired his hands and feet. At this moment Richardson discovered a second man was present. Richardson was not asked to, nor did he; identify either of the men as the accused. While Richardson was on the floor, a Mr. Yates entered the bank. He was not introduced as a witness. Following Yates, came C. Y. Williams who had an office in the bank. He walked to his desk, laid down his mail, walked back to the cage, and as he was in the act of pulling off his raincoat, he observed a man, a distance from him of about five steps, approaching. He identified the accused as the man who approached him, from his carriage and voice, claiming that he was a musician. Next after Williams, Henry Long, an old colored man, entered the bank, when some one grabbed him and tried to put him in a room; the old colored man began to kick at the one who had grabbed him, when some one in the rear struck him over the head from which he bled profusely. While this was occurring, Long made an outcry. He did not undertake to identify the accused. While Long was "hollering," Mr. and Mrs. O. M. Smith were in the act of entering a hallway which lead to O. M. Smith's office and from which a door entered the bank. O. M. Smith was reading his mail and only observed the men pass out at the door and gave neither of them any attention. He did not identify the accused. As Mrs. Smith heard some one make an outcry in the bank, she opened a screen door and started to enter the hallway. At that moment she observed two men coming out the bank door carrying guns; she was within two

feet of them; one was wearing a cap, "amber colored glasses," "small brown striped trousers," and a "brown suede jacket." She was asked if she had seen either of those men since that time. Her response was, "Yes, I feel sure that I have." Following this question, she was asked if she saw either one of them at that time. She answered, "Yes, I think I do." She then pointed to the accused. She was then asked if she could be mistaken. She stated, "No, I am not certain that this is the man, though I am satisfied in my own mind that he is." Ira Lee claims that at the time the two men left the bank, he was just across the street. He identified the accused as one of them, and stated, "When I first saw him he came out of the door of the bank with a pistol in one hand; he came around the back of the car and got in the driver's seat and drove off." At that time he was 24 steps from the men. He was asked if the one whom he identified as the accused looked him "square in the face"; he responded, "they were facing me when they came around the car; he was bound to be facing me when he turned and got in the car." He claims the accused at the time was wearing a "dark cap," "overall jacket," "blue overalls" and "blue pants." When asked if his trousers were "striped," he stated, "I said they were blue and I'm going to stick to it." When inquired if he had on spectacles, his answer was; "I could not say."

Willis Johnson and John M. Johnson resided at Corinth, a half mile from the public highway, about six miles from Russellville. On Saturday morning, the 22d day of September, in a Plymouth coupe or coach, two men arrived at their home about 8:30; one of them asked John M. Johnson to take him to town, saying, at the time, a bearing of his car had burned out, and he wanted to go and get one. John M. Johnson was the owner of a 1929 Ford coupe, black with green wheels and a white top, carrying a Logan county license. At the request of the men, he went and got his car and brought it near the Plymouth; at this point, one of the men drew a gun on him, took possession of the Ford and loaded guns and money in it, drove away, leaving the Plymouth in which was a quilt, going in a direction leading away from Russellville. The man who drew the gun on him was wearing a "black cap," "solid blue overalls," and a "blue shirt." He was wearing "brown

goggles'' at the time he first arrived at their home and did not put them on after his arrival. He identified the accused as the one who drew the gun on him and transferred the money from the Plymouth to the Ford car. As John M. Johnson was in the act of going to get the Ford, as he was requested, Willis Johnson turned to go to the house to get his shoes, when the one of them, Willis identified as the accused, ''drew a gun on him.'' He says this occurred about 9 o'clock. He was in the presence of the two men about two minutes, and he became excited when he drew a gun on him. He identified the accused as the one who drew the gun on him, and stated that at that time he was wearing a black cap, blue overalls, and no trousers; he claims the accused put the goggles on at the time he was in the act of transferring the money from the Plymouth to the Ford.

The sheriff of Simpson county, the chief of police of Franklin and McClenden were called about 8:30 o'clock on that morning, and were given information concerning the robbery and the escape of the robbers in a Ford. Traveling in an automobile, they endeavored for about an hour to overtake them.

Hubert Lane, a mechanic, at Portland, Tenn., received a service call for gas; in response, he carried gas a mile and a half or two miles on the Old Mitchellsville road, between Portland and Mitchellsville, to a 1929 Ford coupe with Kentucky license. Two men were in it. He delivered the gas; one paid him 13 cents, and the other $1, for the gas. He says he paid no particular attention to them, but that he would know them. On being requested to point out either of them, if he recognized any one present as one of them, he said, ''this gentleman right over there with a scar on his face, I think, to the best of my knowledge is one of the men.'' He says this occurred about 10 o'clock a. m., on Saturday, the 22d day of September. He claims one of them was wearing blue overalls. He did not remember whether he was wearing a hat or a cap. He says he did not really think he had on a jumper or a jacket. He was at the car ten minutes. The only identification of the defendant made by him was in this language: ''To the best of my knowledge it was he; I could be mistaken.''

Euie Phillips, a blacksmith who resided about six

miles south of Portland, Tenn., claims that two men passed his place of business in a Ford V-8, going at the rate of about 20 miles an hour. He was asked "to look around and see if he saw either of those men in the court house." His response was, "seems like I have seen that bird before, sitting right there." He stated at the time he saw the two men pass his place of business in the Ford, "the other man was sitting between the accused and the witness," and at the time he testified he stated the accused "resembled him." He was unable to give the complexion, the dress, or the color of the hair, or the eyes of the other man who was sitting in the Ford at the time it passed his place of business, nor did he know whether he was wearing a mustache or goggles. He also testified that he saw these two men at Bruce's Filling Station about 7:30 or 8 o'clock on Thursday night before Saturday, the day of the robbery. The one he stated resembled the accused called for a road map. He did not have any conversation with either of them; or explain how far or how near to them he was, or otherwise state any fact upon which he based his opinion that either of them was the accused.

Paul McGlothin who resided at Portland, Tenn., at the time the bank was robbed, testified that around 10 o'clock he saw two men in a 1929 Ford coupe, west of Portland in the road leading from Portland to the Old Mitchellsville road. It was bearing a Logan county license. At the time he saw them he was "coming through that short cut road"; he gave no "attention to them"; he identified the accused as one of them and admitted that at the time he saw him in the car on the road, the accused was "on the opposite side," and he did not know "what he looked like." He had never before seen the man, and had never seen the accused before he saw the two men in the car on the road. He was asked "if there is any way for you to be mistaken about this." His answer was, "No, sir."

Mrs. Hattie Station resided at Clarksville, Tenn. Previous to the robbery of the bank, C. R. Nichols and his daughter were her neighbors, and the daughter owned "a perfectly new" gray or tan Chevrolet. She testified that she saw some one at Clarksville get in the Nichols car and take it away; that she "just got a glimpse at him"; he was "kinda tall." Before she testified she was taken into the courtroom and directed

to look about to see if she recognized the person she observed take the Nichols car. On the witness stand, she was asked:

"Did you see a party in the court room that resembled the party that you saw take the car? A. Well, slightly from a side view.

"Q. Where is that party? A. Next to the end."

Being asked as to the kind of clothes he was wearing at the time he took the car, she stated, "brown clothes and a brown hat." She was asked, "You don't say he [the accused] is the man who you saw taking the car? A. No, sir, just resembles him."

J. E. Ladd identified the Chevrolet which was left by the two men at the home of the Johnsons as the Nichols car. The sheriff of Logan county brought to Russellville the Johnson car. About 3 o'clock on the afternoon of the day of the robbery, he also found in the woods, about 100 yards from the highway, the Johnsons' 1929 model Ford, about six miles south of Portland, Tenn. He found a letter that had been torn to pieces and printed instructions of the manufacturer of rubber gloves, giving directions "how to put them on and how to take them off."

Dixon Robinson testified that he was a detective, connected with William J. Burns International Detectives. He was employed by the American Bankers' Association to investigate the robbing of the bank at Russellville, and while so engaged he and his companion, O. H. McEndree, at Camden, Tenn., purchased a box of "Miller, Frosted, Size 7, Rubber Gloves" at the drug store of the father of the accused. In the box was printed directions for "the use and care of rubber service gloves." It is identical with that which was found by the sheriff at the Johnsons' Ford car.

To overthrow the weight of the foregoing testimony, the accused testified in his own behalf and introduced many witnesses. He testified he was a registered pharmacist and previous to, and at the time of, the robbery of the Southern Deposit Bank of Russellville, working at the drug store of his father, at Camden, Tenn. Without reproducing or considering his testimony, we shall proceed to review that of his witnesses. Dr. Hicks,

a resident of Camden, Tenn., and a regular, licensed, practicing physician, with his wife, in company with the accused and his wife, about 7 or 8 o'clock, on Friday night before the bank was robbed on Saturday morning, in an automobile, left Camden and went 20 miles to Huntington, Tenn., to a picture show. They witnessed the show named "Here Comes The Navy." After the show they witnessed for a short while a dance, then returned to Camden between 11 and 12 o'clock, separating from Fry and his wife in front of their home. Dr. Hicks testified that next morning, "between 8 and 9 o'clock," he met the accused in Camden "on the corner in front of the Commerce Bank"; the latter was going from his father's store in the direction of his home. In the afternoon of the same day, he was in the accused's father's store and saw the accused with Hicks' wife and "some more ladies sitting at the table." At that time the accused gave Hicks' wife a package and she gave it to him. On that Saturday morning Dr. Hicks wrote a prescription for Mr. Smother's wife's sister. This prescription was presented to him on the witness stand. Its number is B-980. The bottle on which the label of the prescription was at the time of the trial was presented. The bottle number is B-980. The date of the prescription on the label on the bottle was, and is, "9/22/34." Dr. Hicks declared that this was the true date of the writing of the prescription. The prescription was introduced as a part of his evidence: He says he wrote this prescription between 8 and 9 o'clock on Saturday on the 22d day of September, 1934, the day the Southern Deposit Bank of Russellville was robbed. Mrs. Hicks testified concerning the going to, witnessing the picture show, and returning from Huntington on Friday night, with her husband, the accused, and his wife.

A. M. Pafford, the city marshal of Camden, testified that he was present at the time of the departure of Hicks and wife, the accused and wife, to Huntington to attend the picture show. He also testified he was on duty that night at the time they returned, and he saw and recognized them. Mrs. Hicks further deposed that she was in Fry's Drug Store about 2 o'clock in the afternoon on Saturday and saw the accused at work. Dr. Len W. Daugherty, a regular, licensed, practicing dentist, residing, and with offices, at Camden, Tenn., testified that on Saturday morning, the 22d day of Sep-

tember, 1934, he was in the Fry Drug Store within 10 minutes of 9:30 o'clock; he was able to fix the time at 9:30 by the work in which he was engaged in at his office when he decided to go to the drug store, and that he did go there, purchased a Coca-Cola, and had a conversation with the accused who was standing behind the counter. He remained in the drug store 10 minutes.

E. B. Davidson, a dry goods merchant, engaged in business at Camden, Tenn., saw the accused at his father's drug store, immediately after 7 o'clock in the morning, on Saturday, the 22d day of September, 1934, and also at different times during the day. At the time he first saw him, it was about 7 o'clock in the morning, shortly after he (the witness) had opened his own store and stepped out to sweep the walk in front of it; Fry's Drug Store was next door, and the accused at the time was sweeping the walk, when Mr. Odle, a rural carrier, drove up to the drug store, called for some medicine, the accused "waited on" Odle, at which time the witness spoke to both of them. Shortly after this, the accused, in passing the witness' store, remarked, "let's go to breakfast." At that time the witness' wife came into his store. He saw the accused in the Fry Drug Store at other times during that day, and that he knew the accused had worked in the store all that day.

W. T. Gibson, a grocery merchant, residing at Camden, and engaged in business thereat, deposed that on Saturday morning, the 22d day of September, 1934, the day the bank at Russellville was robbed, the accused came into his store in the morning to purchase eggs. He did not have any eggs; the accused departed after a short conversation about some candy which the missionary society was putting on sale that day. This witness stated, "He came back later, before noon, and bought some of this candy."

Elaine Stigall, an employee of the National Store, Inc., engaged in business at Camden, testified that she left her home on Saturday morning, the 22d day of September, 1934, at 7:45; stopped at the Fry Drug Store and made a purchase; the accused "waited on" her. Her place of work was the third store down the street from the Fry Drug Store. About 9:30, she saw him go into the Gibson store and buy some candy; she and

another girl who worked in the store with her were standing out in front, and he came by and offered them some of it.

R. H. Frank, Field Supervisor of the Government Farm Credit Association, was in his office at the court-house about 10:30 on Saturday morning, the 22d day of September, 1934, when the accused came to the regis-trar's office at the courthouse, where the witness talked with him about 10 or 15 minutes. The accused's busi-ness at the time was to see the witness. In the after-noon of that day, around 6 o'clock, this witness saw him again at his father's drug store.

Floyd Hubbs, an employee of the county registrar's office, with offices in the courthouse at Camden, testified that he was present about 9 or 10 o'clock on Saturday morning, the 22d day of September, 1934, and heard the conversation between him and R. H. Frank in the regis-trar's office. This witness further testified that around 7:30 or 7:45, on that Saturday morning he met the ac-cused in front of Peck's place, going toward the post office. At the time he was going from the direction of the Fry Drug Store, going west on the same block.

Wallace White, a barber, engaged in business at Camden, stated that on Saturday morning, the 22d day of September, 1934, he saw the accused about 10 o'clock in the morning, crossing the courthouse square.

Claude Thompson, engaged in the produce business at Camden, testified that the accused, about 8 o'clock in the morning, on Saturday, the 22d day of September, 1934, came into his place of business and purchased a dozen eggs; about two hours after that, he passed the witness' door going toward his home.

J. D. Griffin, manager of the Tennessee Light & Power Company, at Camden, Tenn., was in the Fry Drug Store around 7 o'clock on Saturday morning, the 22d day of September, 1934. The witness had gone to his breakfast about 7 o'clock and as he came back by the drug store he purchased a Coca-Cola and an aspirin tablet; the accused "waited on" him. At the time he was at the drug store, Odle, the rural carrier, was present.

Lindsey Melton, a dry goods merchant, engaged in business at Camden, three doors west of the Fry Drug

Store, saw the accused between 7:30 and 8 o'clock in the morning at the Fry Drug Store on the 22d day of September, 1934. He purchased a Coca-Cola, and the accused "waited on" him. About 10 o'clock the same day, the accused was in the store of the witness and engaged in a conversation with the witness and his son for a period of 10 minutes.

J. N. Wilford, the pastor of the Methodist-Episcopal Church at Camden, where he had been located 5 years, a native of Graves county, Ky., near Mayfield, formerly the pastor of a church at Paducah, Ky., says that on Friday the 21st day of September, 1934, his church paid a debt of $11,222.12, secured by a mortgage. He intended to have a "mortgage burning," Sunday night. The accused was a member of his church. On Friday, the accused consented to prepare a sign to advertise the "mortgage burning" service on Sunday night. The accused prepared a large sign containing the words: "Debt paid. Mortgage-burning, Sunday night—7:30—Come." This sign is now before us. He saw the accused Saturday afternoon about 2 o'clock at the Fry Drug Store, when he delivered to the witness the sign. At the time it was delivered the witness purchased a Coca-Cola, the accused "waited on" him, then delivered the sign.

Fred Ballard, a dairyman, engaged in business one mile west of Camden, testified that about 7 o'clock, Saturday morning, the 22d day of September, 1934, the accused directed him to leave at the latter's home a quart of sweet milk, and he did so. He had purchased feed on that Saturday morning and also he had not previously been delivering milk to Fry.

Jesse Howell, who was 78 years of age, testified that on Saturday morning, the 22d day of September, 1934, the accused passed his home, within 30 feet of him, about 7 o'clock going in the direction of the Fry Drug Store. Again about 10 o'clock he saw him again going to his dinner. His usual route of travel to and from the drug store was by the home of the witness.

R. L. Odle, a rural carrier, on a route out of Camden, testified that at about 7:30 o'clock on Saturday morning, the 22d day of September, 1934, he received his mail at the post office, then went to the Fry Drug Store to obtain a package of medicine and a package of

cigarettes. The accused delivered the medicine and cigarettes to him. At the time this occurred, Griffin, the manager of the Tennessee Light & Power Company, was present and talked with them. He made and kept a record of the time of his departure on that morning from the post office with the mail.

Ernest Smothers, the postmaster at Camden, testified that on Saturday morning, between 8 and 10:45 o'clock, the 22d day of September, 1934, the accused was at the post office.

A. A. Kane, a clerk in the post office, on duty on that morning, testified he was present and saw the accused at the post office at the same time the postmaster stated he saw the accused there. The clerk in the post office also testifies that on that afternoon he saw the accused at the drug store about 3 o'clock. He purchased Coca-Cola at the drug store. He and Odle, the rural carrier, went together to the drug store. There were lots of people from the country in the store at the time.

Mary McCullough, residing at Camden, next door to the accused, a vacant lot between them, testified she saw him about 9 o'clock a. m. on the 22d day of September, 1934, in front of his home. Her daughter took breakfast at his home and came out just in front of him. She walked a part of the distance to town with the accused. Again she saw him that night after supper at Fry's Drug Store.

P. T. Barrett was at Fry's Drug Store "around 8:45," on the Saturday morning, September 22, 1934, and saw the accused working in the store. The witness went there for the purpose of informing the accused that he could not accompany him to Memphis that morning. Around 6 o'clock p. m. he again saw the accused at the drug store. He and Mr. Frank stopped there and had a conversation with the accused "about going to the lake."

Ernest Cole, engaged in work at a cleaning plant at Camden, testified that on that Saturday morning, between 9 and 10 o'clock, in front of the Melton Dry Goods Store, two doors from the Fry Drug Store, he engaged with the accused in a conversation about cleaning the latter's white flannel trousers. He arranged

with the witness at that time to clean the trousers. He cleaned them and took them back to the store that night and delivered them to the accused.

Fred Champion, a painter and an ex-deputy sheriff for 4½ years, testified that he saw the accused in his father's drug store behind the soda counter "waiting on" the trade, between 7:30 and 7:45, on the 22d day of September, 1934.

Fred Lovell, a deputy sheriff residing at Camden, testified that between 7:45 and 8 o'clock, on that Saturday morning, he was hunting for a man to drive a truck for him; he went to the Fry Drug Store. At that time the accused was "waiting on" Elaine Stigall. Later in the afternoon, between 7 and 8 o'clock, the witness was at the drug store, and obtained some medicine. The accused again "waited on" him.

Miss Edna Watson, a school teacher, testified that on that Saturday morning about 10 o'clock she was at Fry's Drug Store; purchased a Coca-Cola, and the accused "waited on" her. Julia Jordan was present at the time. In the afternoon, between 4 and 5 o'clock, and again that night she was at Fry's Drug Store and the accused was "waiting on" the trade. On one of the occasions the accused's wife, Mrs. Hicks, and Julia Jordan were present. She remained at the drug store at that time about one hour. Julia Jordan, a young lady, testified that Fry's Drug Store was a "popular loafing place for the young folks of the town." She was in the drug store "about 10 o'clock or near that time" by herself on Saturday morning, the 22d day of September, 1934. Later, Jessie Fae Herrin came in. She and the witness were talking together; they purchased Coca-Cola, and Elmer "waited on" them. About 30 minutes later, she was again in the drug store and remained about 15 minutes, and that afternoon, "something between 2 or 3 o'clock," she remained there an hour with Mrs. Hicks and Mrs. Fry. The accused was present on these different occasions.

Grant Hollinsworth, a carpenter residing one mile out of Camden, was in the Fry Drug Store, the 22d day of September, 1934, and met the accused on the street, about 8 o'clock between the boarding house and the barber shop. They spoke to each other. Again about the middle of the day he saw him going out of his father's drug store.

Sherman Bivans, a grocery merchant, was in Camden on the 22d day of September, 1934, and between 9 and 10 o'clock he saw the accused going east, three or four doors from the Fry Drug Store.

Vernon King, an employee at a filling station, was at the Fry Drug Store between 8 and 8:30 o'clock on the 22d day of September, 1934, and saw the accused "wait on" a car in front of the drug store. Later, between 10 and 11 o'clock, he saw him going toward the post office.

Ezell Thompson, an employee of his father, was at the Fry Drug Store, between 7 and 8 o'clock on the 22d day of September, 1934, and saw the accused "waiting on" the trade. The witness delivered milk that morning at the drug store, and the accused was there.

Terry Stigall, a football player, between 7 and 8 o'clock on Saturday morning, the 22d day of September, 1934, was fixing to go to Nashville to give a boy a blood transfusion at the Vanderbilt Hospital and was waiting on the corner, when the accused passed by.

Clyde Allen, another football player, states that between 7 and 8 o'clock, on that Saturday morning, he saw the accused in front of a grocery store, going down the street in the direction of his home.

Ruth Robinson, an employee at the sand office at Camden, around 10:30 o'clock on that Saturday morning, saw the accused cross the road from the post office. At that time the witness' little niece and brother-in-law were in the car, and the accused came to the car and gave his niece two blocks of chewing gum.

Paul Wills, manager of the sand company at Camden, testified that he saw the accused in front of the post office; the latter came across the street to the car in which the witness was sitting and handed his baby two blocks of chewing gum.

George Gatewood, a farmer, working at Bowles' Store, stated that he was at Bowles' Store, between 8 and 8:30 o'clock on that Saturday morning, when the accused came into the store, turned around and walked out; again about 9 o'clock, he came in, remained a few minutes, when they had a conversation about a pair of

shoes; later, about 4 o'clock that afternoon, the witness was in the Fry Drug Store, made a purchase, and the accused "waited on" him.

Ruth Reed, a school teacher, testified that between 8 and 9 o'clock, on that Saturday morning, she saw the accused at Utley's Fruit Store. He went in and sat down by a boy. This witness was in the Fry Drug Store as late as 4 o'clock in the afternoon and saw the accused "waiting on" the trade.

Bill Bivans testified that he saw the accused at Peck's place about 9 o'clock. At that time, Peck and some girls and a Melton boy were present. He saw him as late as 6 o'clock, standing in front of the Fry Drug Store, at which place he had a conversation with him.

Horace Melton worked at Utley's Fruit Store at Camden. He states that at about 7 o'clock or early that morning, the accused came in to buy some eggs. Again about 9 o'clock, he came back in the store, when Ruth Guff sold the store 9 dozen of eggs. At that time, the accused was teasing the witness' son about selling bananas.

R. G. Johnson, an employee of the state highway department, met the accused in front of Peck's place about 7 o'clock on that Saturday morning; the accused was going in the direction of the post office.

A. L. Farrer, a farmer, residing 4 miles from Camden, testified that he was in Camden on September 22, 1934, between 9 and 10 o'clock on that morning; he was at the Fry Drug Store; parked his car in front of it, walked in, and bought a sack of tobacco; the accused "waited on" him. He remained in the drug store 10 or 15 minutes. Later, about 2 o'clock in the afternoon, the witness was again in the drug store and saw the accused "waiting on" customers.

Wiley Parker, a farmer residing 8 miles from Camden, was at Camden on Saturday morning the 22d day of September, 1934, at Fry's Drug Store about 4 o'clock in the afternoon, and the accused was present.

Leonard Peeples, a farmer residing 14 miles from Camden, was in Camden on that Saturday afternoon, at about 4 or 5 o'clock in the afternoon at the Fry Drug Store, and saw the accused "waiting on" trade.

G. B. Utley, who conducted a grocery and fruit store at Camden, states that he was at his place of business on Saturday morning between 8 and 9 o'clock on the 22d day of September, 1934, when the accused called at his store and remained 5 or 10 minutes. During the day the accused was in his place of business teasing the witness' infant son.

Mrs. W. E. McCullough, the mother of the accused's wife, told of the departure of the accused and his wife, and Mr. and Mrs. Hicks, for the picture show and their return; she stated the accused remained at home during the night and left next morning for his work at the drug store around 7 o'clock. He came back to breakfast, and, after eating, returned to his work. She told about his bringing eggs about which other witnesses testified. Mrs. U. A. Potts, an aunt of the accused's wife, corroborates Mrs. McCullough.

Edward Thomas, a 19 year old farm boy, testified that he was in the Fry Drug Store, around 8 or 8:30 o'clock on that Saturday morning; went in with his brother and saw the accused "waiting on" the trade; later in the day, again saw him in the drug store once or twice, between 9 or 10 o'clock.

John Harris, a disabled war veteran and adjutant of the local American Legion, testified that he was in Camden on that Saturday morning, around 10 o'clock, at the courthouse and saw the accused in the "Legion Hut" in the basement of the courthouse. He had a conversation with the witness and inquired of him when he was going to Nashville, as he wanted to catch a ride. Later, saw him going down the street toward the post office.

H. Stigall, an employee of a grocerman engaged in business at Camden, testified that about 9:45 o'clock on that Saturday he saw the accused at the Fry Drug Store, purchased a Coca-Cola of him; there was a crowd in the drug store at the time playing dominoes.

C. C. Sparks, a farmer residing 9 miles from Camden, was at Camden on that Saturday at the Fry Drug Store, about 15 minutes to 10 o'clock and later between 12 and 1 o'clock, and still later at 3:30, and on all three occasions the accused was in the drug store "waiting on" the trade.

H. R. Mitchell, a farmer, was at Camden in the Fry Drug Store on that Saturday around 8:15 or 8:30 o'clock a. m., and purchased a Coca-Cola and an aspirin tablet; the accused waited on him. Later, the witness was in the drug store a time or two on that Saturday and the accused was still "waiting on" customers.

E. N. Henry, an employee of the McGrady Motor Company, Ford dealers, at about 8 o'clock on that Saturday morning, was at the Camden Produce Company, when the accused came in and purchased a dozen eggs of Mr. Thompson. The witness later saw him twice that day; passing on the street and also working in the Fry Drug Store.

C. P. Lashlee, a farmer residing about three miles from Camden, on that Saturday, was at Camden in the Fry Drug Store a few minutes after 9 o'clock. He made a purchase and the accused "waited on" him.

On his cross-examination, Fry was asked if he had previously been indicted. Over his objection he was required to answer and his response was that he had been. He was, also, inquired of as to his acquaintance and association with named individuals, and whether he had been with them in Russellville, and Logan county, or other places, or if he had been in other counties in Kentucky prior to the robbery. He stated that his wife as a girl had attended Logan College, at Russellville, Ky., and, while so doing, he had visited her on one occasion. The accused admitted casual acquaintance, but denied his association, with the named persons; also his presence in other counties in Kentucky. In rebuttal, the commonwealth was permitted to prove that he was in Logan county in 1923, with the individuals named in the question, and others, and at other places, and at other times, out of Kentucky; that he had been seen in another county in Kentucky previous to the robbery. No evidence was offered to impeach his character other than this line of questioning, to which the accused at the time objected.

A defendant who testifies in his own behalf may be impeached by showing statements made by him contradictory to the testimony he had given, or by evidence that his general reputation for untruthfulness or immorality renders him unworthy of belief, but not by evidence of particular wrongful acts, except that it may be

shown. by the examination of a witness, or a record of a judgment, that he has been convicted of felony. Vessels v. Com., 234 Ky. 628, 28 S. W. (2d) 964. And when such evidence is admitted, the safer practice is for the court to admonish the jury that it is only admissible for the purpose of impeaching the character of the witness. Bess v. Com., 116 Ky. 927, 77 S. W. 349, 25 Ky. Law Rep. 1091. But it is not a reversible error to fail to do so, unless a request is made to the court so to instruct the jury. Haywood v. Com., 161 Ky. 338, 170 S. W. 624. It is improper in any case to inquire of him as to a particular act or crime, or as to whether he has been indicted or arrested for a particular offense (Hickey v. Com., 185 Ky. 570, 215 S. W. 431; Graves v. Com., 186 Ky. 479, 217 S. W. 356); nor is it proper to cross-examine him as to any fact which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence and discrediting his testimony in case he denies the fact. Hayden v. Com., 140 Ky. 634, 131 S. W. 521; So. R. Co. in Ky. v. Jones, 172 Ky. 8, 188 S. W. 873; Cincinnati, N. O. & T. P. R. Co. v. Prewitts' Adm'r, 203 Ky. 147, 262 S. W. 1. When the objectionable testimony above outlined is tested by these rules, it is apparent it is inadmissible.

Reverting to the witnesses of the commonwealth, those who attempted to identify the accused at the time of the trial had never seen him before the day of the robbery. At the time it was committed, it was raining and early in the morning. The interior of the bank, because of the early hour and condition of the day, to use the language of the cashier, was "very poorly lighted." After "wiring" the colored janitor, according to his testimony, the one of the participants who was identified by him as the accused put on "big brown goggles." Mrs. Smith, who witnessed their departure, stated that the man she identified as the accused was wearing "amber colored glasses" at the time he came out of the bank. Willie Johnson testified that at the time the two men were at the home of himself and brother, the man whom they identified as the accused was wearing colored glasses at the time of his arrival and departure. Thus it is shown that at the time he was in the presence of these witnesses, if it were he, during the robbing of the bank, and commandeering the Johnson car, he was wearing "big brown goggles," a

cap, and overalls. Thus garbed, it should be admitted that after this paraphernalia was discarded and ordinary dress put on, there would naturally be a marked distinction between the appearance of the person wearing the first, and when dressed in the second, costume. Of the witnesses claiming they identified the accused as one of the robbers, only Tom Garrison, C. Y. Williams, Ira Lee, John M. Johnson, and Willie Johnson were unequivocal in their identification. The statements of the other witnesses who identified him are, "I think he is;" or "he resembles" him. In Foure v. Commonwealth, 205 Ky. 62, 265 S. W. 443, 445, we ruled that it was improper to permit a witness to testify that she "thought" she saw a certain person. In Asher v. Commonwealth, 221 Ky. 599, 299 S. W. 203, the witness' statement was: "I believe the accused is the person whom I saw committing the crime." This was held admissible, although the witness declined to swear more positively. The testimony of Mrs. Smith and Hubert Lane was competent under this ruling. But we have never ruled that where a witness identifying a stranger merely states that he "resembles" another stranger, such statement was either competent or of probative value.

The sole defense of Fry is an alibi.

We are not unmindful that it is history that the ordinary alibi witnesses in a large majority of prosecutions spring up at an opportune time, frequently at the eleventh hour, and are generally the chums, the coagitators, kin folks, and the members of the accused's immediate family. And too often this character of witnesses testify in comic chorus when establishing a fake alibi to avert or overthrow a conviction of a guilty defendant.

In the present case, there is no token or sign of this class of witness or alibi. Their testimony is either honest and predicated on the truth, or it is mass perjury, voluntarily committed.

It is agreed that the bank was robbed early in the morning on Saturday, the 22d day of September. The indictment was returned on the 26th, at which time the accused had been arrested and was in custody of the sheriff of Logan county. This trial began October 4th, and the case was submitted to the jury on October 9, 1934. Thus it appears that the testimony of the wit-

nesses both of the commonwealth and the accused was directed to a certain Saturday, and that no other Saturday had intervened between the commission of the crime and the commencement of the trial.

The witnesses of the accused were thoroughly acquainted with him and his place of business. It was not possible for them to be mistaken in the Saturday involved; or of his identity. On the other hand, the witnesses of the commonwealth observed the participants in the robbery and formed their opinion of the accused's identity during the excitement incident to a tragic robbery, and most of them, at the time, in a room that was poorly lighted; all of them while he was disguised with goggles, cap, and overalls. While their testimony bears the impress of truth and is entitled to be regarded honest and made in good faith, yet it is in reality a mere expression of an opinion based upon the most casual observation made under the tenseness of excitability. It is perfectly consistent with the hypothesis of mistaken identity.

It is shown by the evidence of the commonwealth that after the robbery the robbers, in the Johnson car, at 10 o'clock a. m., were at Portland, Tenn., near the Kentucky-Tennessee line, a distance of about 100 miles from Camden. Thus it is shown that necessarily he was absent from Camden, at least until about or near noon of that day, considering the distance from Portland to Camden. In addition to this, it is shown by the testimony of the witnesses of the commonwealth that a representative of the Burns Detective Agency and his companion, after the robbery and before the calling of the prosecution for trial, visited Camden presumably to investigate the accused's connection with the robbery. The sum of their investigation was the purchasing at the Fry Drug Store of a pair of rubber gloves with printed instructions of the manufacturer how to put them on and take them off, which the evidence shows may be purchased most anywhere by any one. It is presumed that the detective and his associate utterly failed after inquiry at Camden to secure the name of any witness either a friend or a foe of the accused by whom it could be proven that he was not at the place of his business on the morning and during the day of the robbery, since it is not shown that they reported to the officials of the commonwealth the name of

such a witness. These facts are significant and are strongly corroborative of the evidence establishing the accused's alibi.

In the circumstances, the incompetent evidence which we have considered doubtless added weight in the estimation of the jury to the commonwealth's witnesses' identification, and discredit to that in behalf of the accused.

It is general knowledge that a tragic robbery in a rural community generates great prejudice, arouses an intensely hostile feeling against the one accused, and justly so, and naturally a dominant, adverse influence prevails at his trial when held as soon after the commission of the crime as that in the present case. However, we do not mean by this statement, nor is it to be inferred from our making it, that the trial of the accused so soon after the robbery was irregular or improper; but we merely mention the fact for the purpose of showing there was no "cooling time" for either the eyewitnesses or the jurors of the vicinage, between the commission of the robbery and the accused's trial.

The jury considered the case 28 hours. This fact is extremely expressive of the thought that during that period they were entertaining doubt of Fry's guilt.

As honest as we believe the witnesses of the commonwealth to be in their conviction of the correctness of their identification of the accused, sifting the whole of the evidence, with the seine of common sense measuring it with the compass of experience, viewing it with a disinterested and unbiased mind, actuated by an impelling sense of our duty to administer and enforce the law with perfect fairness and justice, it is our matured view that the verdict of the jury is palpably against the weight of the evidence.

We have consistently adhered to, and applied, this rule in many cases. See Marcum v. Commonwealth, 223 Ky. 831, 4 S. W. (2d) 728; Ferrell v. Commonwealth (Ky.) 127 S. W. 162; Martin v. Commonwealth, 178 Ky. 439, 198 S. W. 1158; Peay v. Commonwealth, 181 Ky. 396, 205 S. W. 404; Slaton v. Commonwealth, 193 Ky. 449, 236 S. W. 952; Smith v. Commonwealth, 216 Ky. 813, 288 S. W. 752; Stephens v. Commonwealth, 226 Ky. 437, 11 S. W. (2d) 111, and Copeland v. Commonwealth, 216 Ky. 286, 287 S. W. 721.

Fry argues that his denial of participating in the commission of the crime, though the evidence of the commonwealth establishes without contradiction it was committed with deadly weapons, entitled him to an instruction fixing his punishment under section 1159. Instructions always should be based on the evidence and to suit the case in hand. Payne v. Commonwealth, 255 Ky. 533, 75 S. W. (2d) 14. His denial did not entitle him to this instruction.

Complaint is made of the impaneling of the jury, the recross-examination of the accused, and certain alleged conduct of the sheriff and deputy at the time the accused and his counsel were in a room consulting. Inasmuch as neither of these grounds of complaint may occur at another trial, if one is had, we do not deem it required of us to discuss them.

The judgment is reversed for a new trial, consistent herewith.

The whole court sitting, except Perry, J: