## Southers v. Commonwealth.

(Decided May 15, 1925.)

### Appeal from Bell Circuit Court.

1. Homicide—Evidence of Defendant's Insanity Held Insufficient to Warrant Setting Aside Verdict.—In homicide prosecution, in which ·insanity was set up as a defense, evidence of defendant's insanity held not so conclusive as to warrant setting aside jury's verdict that defendant was sane.

2. Criminal Law—Test in Determining Insanity, Relieving Defendant from Consequences of Criminal Acts, Stated.—Fact that defendant has some form of insanity, or is in some degree insane does not relieve him of consequences of his criminal acts, but it must in addition appear that because of his insanity he did not know right from wrong, or that he did not have sufficient will power to govern or control his conduct and refrain from doing the criminal act.

3. Homicide—That Defendant had been Adjudged Insane and Never Adjudged Restored Not Conclusive of State of Mind at Time of Homicide.—Fact that defendant, prosecuted for murder, had been adjudged insane prior to commission of crime, and had never been adjudged restored, is not conclusive of the state of mind at time of commission of crime, but test is always whether or not he had mind enough to know right from wrong, or was incapable of refraining from commission of crime because of a diseased mind.

W. J. STONE for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming.

Appellant, charged with the murder of George Neal, was convicted and sentenced to life imprisonment.

Neal was his brother-in-law and had formerly lived in Bell county, but about two years before the homicide had removed to Pennsylvania. At the time of the killing he was on a visit to his relatives in Bell county.

So far as is disclosed in the record the brothers-in-law had always been on good terms, and until Neal's visit had not seen each other for about two years. The night before the homicide Neal had spent with other relatives only a short distance from appellant's home in a suburb of Pineville, and the next morning after eating breakfast he went to appellant's home. The screams of a woman were heard, and shortly thereafter Neal was seen

running from appellant's home with appellant in pursuit firing at him with a pistol. He followed Neal about two hundred yards and fired several shots which resulted in his death. After reloading his pistol he then returned to his home and there shot and killed his wife.

There were only the three witnesses to the beginning of the tragedy, and as appellant himself did not testify, and the other two witnesses are dead, we are wholly in the dark as to its origin or cause.

On his trial defendant's counsel relied wholly upon the defense of insanity, and the evidence tended to support it. It disclosed that about two years prior thereto defendant had been tried under a writ of lunacy and adjudged to be a lunatic, and had been taken to the state asylum at Lexington. He remained at the asylum until about seven or eight months before the homicide, at which time the asylum authorities turned him over to a brother so that he might go to his old home and there be in the custody and under the control of his brother and other kinspeople, although there is nothing to show he was discharged from the institution as having been restored to sanity. However, it may be fairly assumed that he would not have been thus temporarily released from the institution and placed in the custody of his brother if there had not been marked improvement in his mental condition.

The evidence discloses that after his release in the way stated, he went to his old home and in most every way appeared to be as he had always been with two exceptions, they being that he could not do as much work as he formerly did, and he did not talk as much.

One physician testified, who had examined him when he was tried on the writ of lunacy, but had not seen him since his release from the asylum. In response to a hypothetical question he expressed the opinion that a man who had acted as assumed in the question was either drunk or crazy. Another physician who did not actually testify, it was agreed, would give the same evidence.

Several nonexperts who had seen and associated with appellant since his return from Lexington, expressed their opinion as to his sanity, most of them indicating their belief in his insanity; but at least one man with whom appellant had lived for four months after his release, and who saw him often thereafter and worked with him in the mine, expressed the opinion that at all times he knew right from wrong, and was responsible for his acts. This last witness evidently had a better op-

portunity than any other testifying on that subject to judge of appellant's sanity at or about the time of the homicide; he had lived in the house with the witness for four months of that time, he had worked with the witness in the mines at other times, and the witness was connected with him by marriage.

Taking into the estimate, therefore, that although defendant was not discharged from the asylum as restored, that he must have been deemed by the asylum authorities as vastly improved; and considering the evidence that in many respects he seemed as he had always been, and that there is no evidence of any other insane act or conduct by him during the period of his release; and considering that the evidence of the two expert witnesses was wholly inconclusive on the question of sanity, we are not prepared to say there was no evidence to support the verdict of sanity.

There is no complaint of the instructions, it being conceded that the instruction on insanity is correct, but the sole contention is that there was really no evidence that defendant was sane or responsible for his acts at the time of the homicide, and that therefore the court should not have submitted that question to the jury.

The fact that a defendant has some form of insanity, or is in some degree insane, does not relieve him from the consequences of his criminal acts. It must in addition appear that at the time, because of his insanity, he did not know right from wrong, or that if he did, because of some insane impulse or other form of insanity he did not have sufficient will-power to govern or control his conduct and refrain from doing the criminal act. The true test has been said to be,

"Whether accused had sufficient reason to know right from wrong, and whether or not he had sufficient power of control to govern his action." Montgomery v. Commonwealth, 88 Ky. 509; Banks v. Commonwealth, 145 Ky. 800; Hall v. Commonwealth, 155 Ky. 541.

As said in the Hall case, the evidence of insanity is strong here, and as it appears from the record tends to excite grave doubt in the minds of the court on that question; but in this case, as in that, there being evidence to sustain the verdict, and sufficient to uphold it, there is no alternative except to affirm the judgment.

Nor is the fact that accused had been, prior to the commission of the crime, adjudged insane, and had not at the time either been discharged as cured or adjudged to have been restored, conclusive of his state of mind at the time of its commission. The test is always whether or not at that time he had mind enough to know right from wrong, or was because of a diseased mind incapable of refraining from the commission of the crime. Miller v. Commonwealth, 197 Ky. 703; Miller v. Commonwealth, 200 Ky. 435.

Judgment affirmed.