**Goebel Lee NEWSOME, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Dec. 14, 1962.

Dissenting Opinion Jan. 15, 1963.

Rehearing Denied April 19, 1963.

Francis M. Burke, Pikeville, for appellant.

John B. Breckinridge, Atty. Gen., Martin Glazer, Asst. Atty. Gen., Frankfort, for appellee.

STEWART, Chief Justice.

Appellant, Goebel Lee Newsome, was indicted for the wilful murder of Lawrence Robinson. He was convicted in the Pike Circuit Court of voluntary manslaughter and sentenced to 21 years in the penitentiary.

The evidence for the Commonwealth established that Newsome and his co-defendant, Roy Branham, and Lawrence Robinson and Ireland Robinson, the latter two being brothers, got together about 5:00 p. m. on

the afternoon of November 11, 1960. They visited a number of places including a road house before going to the home of Charles "Bit" Elswick on the top of a remote mountain between Caney and Marrowbone creeks in Pike County.

After spending about on hour with Elswick, his wife and some others who were visiting the Elswicks, Newsome, Roy Branham and Lawrence Robinson went out of the Elswick house. A short time later Elswick heard some commotion which caused him to open his front door and look out. He saw Lawrence Robinson lying face down and Newsome standing near him with a baseball bat in both hands. Ireland Robinson, the brother of the prone man, presently appeared and he and Elswick both testified that Newsome said: "I have killed your brother and I'm going to kill you too, damn you", and started advancing and striking at him. Lawrence Robinson died early the next day from the injuries thus received.

Newsome's defense at his trial was insanity. He testified that at the age of 12 he fell and severely injured his head. Since that time he has been subject to blackouts of varying duration. He stated he did not remember anything from a time shortly before the murder until he came to his senses, about four days later, and found himself in Harvard, Illinois, a town close to Belvidere in that state where he then resided. When his wife informed him he was wanted by the police, according to his testimony, he promptly surrendered himself.

Newsome's wife and mother testified to the fact that he often had seizures during which time he became uncontrollable and violent. Two doctors testified that, from physical examinations and tests such as an encephalograph and a study of his past medical history, which included a mastoid operation, Newsome suffered from an organic deterioration of his brain cells and that such deterioration amounted to a mental defect or disease which led to the mental blackouts of which he complained and which produced a lowered control of his activities.

Appellant first argues that the M'Naghten Rule which is applied in Kentucky to determine criminal responsibility as to mentally defective persons should be struck down. The trial court instructed on insanity using the M'Naghten test. The M'Naghten Rule is to be found in 8 English Reports, Reprint, at p. 722 et seq. (1843), and was engendered by the excitement and fear which grew out of the acquittal of Daniel M'Naghten who had attempted to assassinate Sir Robert Peel, the then Prime Minister of England, but who instead shot Peel's private secretary, Drummond, because M'Naghten had mistaken Drummond for Peel. See United States v. Currens, 3 Cir., 290 F.2d 751.

A fairly recent panel conference on mental disease as it relates to criminal responsibility was held at the Harvard Law School and this problem was considered at length. The participants were Professor Abram J. Chayes of the Harvard Law School, who had assisted in the preparation of the Durham opinion and who presented the view adopted therein (See Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d, 1430); Professor Herbert Wechsler of the Columbia Law School, Chief Reporter of the American Law Institute's Model Penal Code, who presented the American Law Institute's view (the Model Penal Code, which promulgated what might be called "the irresistable impulse" test, was adopted at a meeting of the American Law Institute in Washington in May of 1962); and Professor Jerome Hall of the Indiana University School of Law, who presented the M'Naghten view.

The proceedings of this symposium, in part, appear under the title of Mental Disease and Criminal Responsibility— M'Naghten versus Durham and The American Law Institute's Tentative Draft in 33 Indiana Law Journal, pages 212 through 225. Professor Jerome Hall, the author of this law journal article, discusses critically the views mentioned above. For a fuller discussion of mental disease and criminal

responsibility see the publications dealing with this subject in the footnote references to the law journal article.

The McNaghten Rule has become fastened onto the law of England and is controlling in practically all of the states, and has also been followed by nearly all of the federal courts. Kentucky has consistently adhered to this rule. See Corder v. Commonwealth, Ky., 278 S.W.2d 77; Sharp v. Commonwealth, 308 Ky. 765, 215 S.W.2d 983; Horn v. Commonwealth, 292 Ky. 587, 167 S.W.2d 58; and Cline v. Commonwealth, 248 Ky. 609, 59 S.W.2d 577. The simple formulations of the McNaghten Rule are thus set forth in Professor Jerome Hall's law journal article at page 213:

"* * * The McNaghten Rule is the rule of reason. It is stated * * * in two formulas * * *. One * * * is—does the defendant have the competence to understand ordinary everyday things and actions and the ordinary consequences of these actions? This is what psychiatrists talk about in terms of 'the reality principle.' And the other wing of M'Naghten asks, does he have the competence to understand ordinary valuations which, in the criminal law, means, e. g., does he know that it is wrong to bash in somebody's head or to kill a human being? * * *."

Appellant's chief criticism of the M'Naghten Rule is that it is archaic and obsolete, and that this Court should substitute therefor a so-called realistic and workable test to resolve the criminal responsibility of the insane or mentally ill, based upon present knowledge developed by research and study in this area by the medical, psychiatric and psychological professions.

■ It is argued that the relation of mental illness to criminal responsibility should be left to the determination of experts, the psychiatrists and the psychologists, and that the courts should be guided by their more enlightened diagnosis of the particular mental disease under consideration. But the problem then arises, which experts shall we believe, for it is a matter of common observation that there are no basic psychiatric or psychological concepts that all psychiatrists or psychologists are able to accept unconditionally.

Psychology, including psychiatry, deals with vastly complex and impalpable data. Eminent psychiatrists themselves have testified as to the status of psychiatry: e. g., H. S. Sullivan, that "the best psychiatry is still more of art than of science"; and C. G. Jung, that "there are, in fact, many methods, standpoints, views and convictions which are all at war with one another." See Psychiatry and Criminal Responsibility, 65 Yale Law Journal, 261, 772.

The purpose of this opinion is not to discuss in detail or undertake to evaluate the Durham Rule and the American Law Institute Rule. Appellant leaves us in the dark as to which of these rules he would have this Court adopt. At the present time, proponents of the one rule are unable to agree upon the principles underlying the other. As both of these rules have evolved from the research of psychiatrist and physiologist, we believe as Professor Jerome Hall states the proposition in the last sentence of his law journal article. He said: "But there must be a great deal of study before we can determine what is valid and how to use the insights and discoveries of clinical work effectively without destroying the values represented in our law."

This Court concludes the M'Naghten Rule should be retained as the test for criminal responsibility in this jurisdiction.

■ Appellant next argues that he was entitled to a directed verdict of not guilty by reason of his insanity; that the Commonwealth was entitled to rely upon the presumption that he was sane; but that appellant's uncontroverted evidence of insanity rebutted such a presumption and the

jury had no evidence upon which to base its finding of sanity.

█ It is true the Commonwealth did not introduce any evidence to rebut the testimony of insanity. In criminal actions the mere fact that a defendant has some form of insanity does not relieve him from the consequences of his act; he must be so bereft of mind as to render him incapable of knowing right from wrong or, if knowing, incapable of controlling his actions.

It is apparent from the medical testimony introduced that the question of appellant's insanity at the time of the commission of the act did not resolve itself into one of law but was an issue of fact to be determined by the jury. It follows that the Court did not err in overruling appellant's motion for a peremptory instruction. See Sharp v. Commonwealth, 308 Ky. 765, 215 S.W.2d 983.

█ Appellant's final contention is that "Instruction 4–A" on drunkenness was erroneous and highly prejudicial to appellant's substantial rights. We do not agree. The instruction given in the present case is almost identical to the model set forth in Vol. 3, sec. 902(2), p. 217, of Stanley's Kentucky Instruction to Juries. It was approved in Arnold v. Commonwealth, 194 Ky. 421, 240 S.W. 87, and Mathley v. Commonwealth, 120 Ky. 389, 86 S.W. 988. In the former case, the defense against homicide was insanity. There was evidence offered that the defendant had been drinking. This Court stated:

"* * * it would not have been error for the court to have instructed the jury that, if his lack of reason to know right from wrong, or lack of will power to govern his actions, arose alone from voluntary drunkenness, he should not be acquitted upon the ground that he was insane."

In the present case, there was evidence offered that appellant and several others had been drinking intermittently from the time he started traveling to Kentucky until the death of Lawrence Robinson. Thus, it was proper for the court to instruct as it did.

Wherefore, the judgment is affirmed.

PALMORE, Judge (dissenting).

Conceding that a combination of the M'Naghten and irresistible impulse tests is still fundamentally the most practical approach to the defense of "insanity," it can and should be put in a clearer and better form than is stated in our standard instruction, taken from Abbott v. Com., 1900, 107 Ky. 624, 21 K.L.R. 1372, 55 S.W. 196. See Stanley's Instructions, § 901.

In an address [1] before the New York Academy of Medicine on November 1, 1928, the late Mr. Justice Cardozo, then a member of the Court of Appeals of New York, in reviewing the M'Naghten rule and expressing hope for its improvement, spoke as follows:

"In the early stages of our law, way back in medieval times, insanity was never a defense for crime. The insane killer, like the man who killed in self-defense, might seek a pardon from the king, and would often get one. He had no defense at law. Gradually there came in the law itself a mitigation of this rigor. A defense of insanity was allowed, but only within the narrowest limits. This was what has become known as the wild-beast stage of the defense. The killer was not excused unless he had so lost his mind as to be no more capable of understanding than if he were merely a wild beast. Then the limits of the defense were expanded, but still slowly and narrowly. The killer was excused if the disease of the mind was such that he was incapable of appreciating the difference between right and wrong. At first this meant, not the right and wrong of the particular case, but right and wrong generally or in the abstract, the difference, as it was some-

1. "What Medicine Can Do for Law," reprinted in Selected Writings of Benjamin Nathan Cardozo (Fallon Publications, New York, 1947), p. 371 et seq.

times said, between good and evil. Later the rule was modified in favor of the prisoner so that capacity to distinguish between right and wrong generally would not charge with responsibility if there was not capacity to understand the difference in relation to the particular act, the subject of the crime. The rule governing the subject was crystallized in England in 1843 by the answer made by the House of Lords to questions submitted by the judges in the famous case of McNaghten, who was tried for the murder of one Drummond, the secretary of Sir Robert Peel. The answer was in effect that 'the jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defense on the ground of insanity it must be clearly proved that, at the time of committing the act, the accused was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong.'

\*   \*   \*   \*   \*   \*

"I am not unmindful of the difficulty of framing a definition of insanity that will not be so broad as to open wide the door to evasion and imposture. Conceivably the law will have to say that the risk is too great, that the insane must answer with their lives, lest under cover of their privilege the impostor shall escape. Conceivably the twilight zone between sanity and insanity is so broad and so vague as to bid defiance to exact description. I do not know, though I am reluctant to concede that science is so impotent. Attempts at formulation of a governing principle or standard have been none too encouraging, but betterment is attainable, though it be something less than perfection. Many states \* \* \* recognize the fact that insanity may find expression in an irresistible impulse, yet I am not

aware that the administration of their criminal law has suffered as a consequence. Much of the danger might be obviated if the issue of insanity were triable by a specially constituted tribunal rather than the usual jury. Of this at least I am persuaded: the medical profession of the state, the students of the life of the mind in health and in disease, should combine with students of the law in a scientific and deliberate effort to frame a definition, and a system of administration, that will combine efficiency with truth. If insanity is not to be a defense, let us say so frankly and even brutally, but let us not mock ourselves with a definition that palters with reality. Such a method is neither good morals nor good science nor good law. I know it is often said, and very likely with technical correctness, that the statute ought not to be viewed as defining insanity. What it does, and all that it does is to state the forms or phases of insanity that will bring immunity from punishment. All this may be true, yet it is hard to read the statute without feeling that by implication and suggestion it offers something more. It keeps the word of promise to the ear and breaks it to the hope. Let us try to improve its science and at the very least its candor."

It is well known that psychiatrists do not like to discuss mental abnormality in terms of the subject's capacity to distinguish between right and wrong—particularly right and wrong in an abstract moral sense as distinguished from the criminality of the particular conduct in question. To some extent this objection results from a failure to appreciate the different objectives of medicine and the law. The law seeks to ascertain and reflect sound social policy, and a technically correct medical definition of insanity may be, and ordinarily will be, irrelevant to that purpose. Thus we have, and properly so, different criteria as to capacity to make a will, to enter into a contract, to commit a crime, and to stand trial. Still others apply to civil commitment.[2]

2. See, for example, KRS 202.010(1), which defines a mentally ill person as "a person having a psychiatric or other disease which substantially impairs his mental health." ( ! )

That a person is insane from the standpoint of medical definition need not, and of itself does not, suspend his obligation to obey the law unless the defect or disease impairs his capacity to do so.[3] The social policy expressed by the M'Naghten rule is that if a man has enough wit to know right from wrong in the matter at hand it will be presumed that he is capable of submission to the deterrent effect of the law and its consequences. The rule has led a hardy existence because, like the fictional presumption that every man knows the law, it is socially useful.[4] It helps to prevent chaos. And when the idea of irresistible compulsion (by reason of the infirmity) is added, the result makes pretty good sense.

"Whatever legal rule is laid down will reflect a judgment on the basic policy question of the extent to which the state should interfere with the liberty of the individual in the interest of all. The extreme libertarian will perhaps be willing to deprive a person of his liberty only when that liberty endangers others. As for the individual who is sane enough most of the time to understand that in his depressed phases he may commit suicide and who prefers to run that risk rather than go to the hospital, the libertarian extremist might want to allow that choice. At the other extreme are those who would allow the state to act for the person's own good, even when he does not want it. In between, there is room for several other lines of demarcation for those who would weigh individual liberty against social welfare. * * * In criminal law, it has been pointed out that the 'test' of insanity is not a clumsy effort by the profession to define a psychosis. It is an attempt to answer the policy question: granting that the defendant is more or less mentally abnormal, what should we do with him?

Should he be dealt with by the state's penal-correctional program, or by the medical-therapeutic? The answer depends upon our concept of 'justice' and the purpose of punishment, our penal policy, the institutional facilities we have available or that the taxpayers are willing to provide, and other considerations. The law, speaking for the community, has to consider the patient, his health and his rights and responsibilities as a free man, the interest of society in the health and safety of its members generally, and various other, perhaps competing interests. * * * It is true that where the legal rule concerns mentally disordered persons, any answer should accord with current psychiatric knowledge. * * * But the ultimate decision is not merely a psychiatric one. It is a major policy decision. This is the legal rationale of the point frequently made by psychiatrists that they ought not be asked for their opinions on this policy issue, but should testify only on the medical issue, the existence or non-existence of mental illness." [5]

In the paper from which the foregoing excerpts are taken the author goes on to say that there is no valid reason why medical witnesses, recognizing the true purpose of the "legal" definition, should be reluctant to testify in terms of right and wrong, and suggests that the "real reason why psychiatrists object * * * is not that such questions are legal and not medical, but that they are badly conceived and worded."

The attempt to ascertain, by means of a jury trial, just what a man's mental condition was at the time he committed an offensive act is, to me, one of the great follies of our time. So long, of course, as we have capital punishment it will be unavoidable in capital cases. But the truth is that there

3. Cf. Montgomery v. Com., 1889, 88 Ky. 509, 11 K.L.R. 40, 11 S.W. 475, and Southers v. Com., 1925, 209 Ky. 70, 272 S.W. 26.

4. Cf. Dr. Henry A. Davidson, "The Psychiatrist's Role in the Administration of Criminal Justice," 4 Rutgers L.Rev. 578–96 (1950), reprinted in Nice, Criminal

Psychology (Philosophical Library, New York, 1962), p. 13 et seq.

5. Henry Weihofen, "The Definition of Mental Illness," 21 Ohio State Law Journal 1–16 (1960), reprinted in Nice, Criminal Psychology (Philosophical Library, New York, 1962), p. 194 et seq.

can never be a really satisfactory definition of sanity and insanity for purposes of determining guilt or innocence in a criminal trial. I suggest that some day we must drop the defense of insanity altogether, and focus our attention forward rather than backward, to the problem of what is to be done with the offender. The thing of public significance is that the act was committed. It makes the perpetrator a social problem under any circumstances, sane or insane, free will or not. If his conduct bespeaks a public menace, he must be taken in regardless of what is going on in his mind. To determine just what acts and conduct will necessitate a suspension of the actor's liberty for the protection of the public, and to provide procedural safeguards, are policy problems and, therefore, purely legal functions. But an inquiry into his mental state is more properly addressed to the disposition stage: What, if any, treatment is indicated? Should he be sent to a penal or to a medical institution, or a combination of the two? In this phase of the matter, though the law must continue to have a vital interest, its traditional processes are inept and unsuitable, and certainly the courtroom trial can have no valid or constructive role. Here it must be acknowledged that the disciplines of medicine and psychology have a function of equal if not greater adaptability and value than that of the law.

In both public attitude and institutional facilities we are unready as yet to implement the inevitable. It is high time, however, that we scout ahead, if only in the mind's eye. This opinion is an invitation to that end. And there is, in the meantime, room for improvement in our instruction on the defense of insanity. At least, as Prof. Weihofen suggested, it is badly worded if not badly conceived. To illustrate, in Thompson v. Com., 1913, 155 Ky. 333, 159

S.W. 829, this court itself seems to have misconstrued the M'Naghten rule when it rejected the contention that the instruction should be extended so as to submit "the question of whether the defendant knew right from wrong *with reference to the particular offense charged * * *.*"* (Emphasis added.) It may be that the case was argued from the viewpoint that "right and wrong" should be defined in a moral rather than a legal sense, and in this respect the court did follow the orthodox construction of M'Naghten to the effect that the defendant's understanding that he was acting "contrary to the law of the land" would be sufficient to justify conviction.[6] But the appellant was correct in contending that the instruction should relate the test to the specific offense charged, and not to his knowledge of right from wrong in the abstract.[7] The point is that the instruction does not make this clear to the jury, nor, on its face, does it even suggest whether "right and wrong" are to be considered in a moral or in a legal sense.

Section 4.01 of the Model Penal Code approved by the American Law Institute in 1962 proposes the following definition:

> "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality * * * of his conduct or to conform his conduct to the requirements of the law.
>
> "(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

In United States v. Currens, CA 3, 290 F.2d 751 (1961), the court dropped the

---

6. See annotation, "Modern status of the M'Naghten 'right-and-wrong' test of criminal responsibility," 45 A.L.R.2d 1430, 1454-5.

7. See United States v. Currens, C.A. 3, 290 F.2d 751, 764 (1961), n. 15.

"knowledge" feature of the test and suggested an instruction as follows:

"The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

It will be noted that both of these tests center on whether, by reason of defect or disease, the defendant lacked "substantial capacity." In that they do not demand a complete impairment, both would relax the M'Naghten and "irresistible impulse" rules.[8]

In the famous Durham case[9] the approved criterion was whether the unlawful act was "the product of mental disease or defect." As the majority opinion suggests, there is little indication thus far that this approach represents any improvement over what we had before, and particularly is it so if we are willing to make some reasonable improvements in what we had before.

My conclusion is that the rule stated in the Model Penal Code is reasonable and workable. It says in effect that if the defendant, by reason of mental disease or defect, was substantially unable to understand that he was violating the law, or, if he did understand it, was yet substantially unable to resist his impulses to break the law, he has a defense. This is not startlingly different from what our instruction tries to say but says badly. It preserves all that is sound in the policies reflected by the M'Naghten and "irresistible impulse" rules.

It is my opinion that the insanity instruction heretofore approved in this state is not adequate and that it should be revised substantially as follows:

"The law presumes every man sane until the contrary is shown by the evidence. Before the defendant can be excused on the ground of insanity the jury must believe

from the evidence that at the time of committing the offense in question the defendant, as a result of mental disease or defect, (a) did not have substantial capacity to appreciate the criminal nature of the act or, if he did have such capacity, (b) did not have substantial capacity to conform his conduct to the requirements of the law." When appropriate under the evidence (for example, when there is an indication of psychopathic or sociopathic personality), a qualification to the effect that the terms "mental disease or defect" do not include an abnormality evidenced only by repeated criminal or otherwise anti-social conduct should be added.

Because the instructions as given do not sufficiently state the defense I would reverse and grant a new trial.

MILLIKEN and MOREMEN, JJ., join in this dissenting opinion.

---

8. See Commentary, Model Penal Code, Tentative Draft No. 4, p. 156.

9. Durham v. United States, 1954, 94 App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.